**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GOTHAM INDUSTRIES, INC., and Crawford Plastics Corp., Respondents.**

**No. 7160.**

United States Court of Appeals
First Circuit.

Jan. 14, 1969.

Warren M. Davison, Washington, D. C., attorney, with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Corinna Lothar Metcalf, Washington, D. C., attorney, were on brief, for petitioner.

Jerome Medalie, Boston, Mass., with whom David I. Riemer, Julius Thannhauser and Cohn, Riemer & Pollack, Boston, Mass., were on brief, for respondents.

Before ALDRICH, Chief Judge, STALEY,* Senior Circuit Judge, and McENTEE, Circuit Judge.

ALDRICH, Chief Judge.

This is a petition for enforcement of an order of the National Labor Relations Board based upon certain conduct in connection with a promise of a wage increase in alleged violation of section 8(a) (1) of the Act. 29 U.S.C. § 158(a) (1). The facts are somewhat complex and, in their totality, unusual. At Fitchburg, Massachusetts, in a single building, respondents operate two different but related businesses, Gotham Industries, Inc. and Crawford Plastics Corp., which for present purposes constitute a single enterprise. In July 1963 a union [1] began organizing Gotham's em-

---

* Of the Third Circuit, sitting by designation.

1. Retail, Wholesale and Department Store Union AFL-CIO.

ployees and an election was held that November. The union received less than 20% of the votes. The regional director set the election aside because of misconduct by Gotham, and directed that a new election be held "at a date and time to be determined." In January 1964 the union filed unfair labor practice charges, which were sustained by a trial examiner and by the Board. Gotham Indus., 1964, 150 N.L.R.B. 63. Gotham's nonacceptance required review by this court. At the hearing before us Gotham pressed only the alleged overbreadth of the order. Since in this particular it had failed to protect its rights, in May 1966 we directed, without a reported opinion, that the order be enforced. Gotham apparently complied with the order, including the 60-day posting requirement, on or before August 30, 1966, as on that date it was sent the customary compliance letter.

With this background we turn to the facts upon which the present findings of violation are based. In early August 1966 some of the older employees in Crawford's molding room held a meeting of the day shift to demand a wage increase. At their invitation plant superintendent Stauble attended and agreed to discuss their demands with Robert Gottsegen, general manager of both companies. So informed, Gottsegen investigated, and before the end of the month told certain Crawford employees that a wage increase would be made in December. Formal notification of the increase was received by the Gotham and Crawford employees on September 14 and 22, respectively.

On September 23 the regional director informed Gottsegen that a "rerun" election would be scheduled shortly. After he designated the date the union filed an unfair labor practice charge predicated

essentially upon the promised wage increase,[2] and the regional director promptly cancelled the designation.

Thereafter, on October 17, in response to a request by employee Arsenault for a 20 cent raise, Stauble informed her that he could not comply because "the union has stepped in and taken away the 10 cent raise." On October 27, Gottsegen, in response to further inquiries about the fate of the promised raise, distributed a notice to all employees which stated, inter alia,

> "As you know, the Retail Wholesale Department Store Union has filed with the National Labor Relations Board unfair labor practice charges alleging that this pay increase was an unfair labor practice. The Company thinks this charge is absurd and is doing everything in its power to prevent the union from denying our employees this very much needed and very much deserved increase. We are unable to understand why the union, who says they are interested in our employees' welfare, is trying to interfere with our giving you higher pay. Our lawyers are now presenting our views regarding this pay increase to the National Labor Relations Board and we hope to have further information on this in about ten (10) days.
>
> You need this pay increase, you deserve this pay increase, and we intend to give it to you."

And, finally, on December 1, the wage increase was instituted.

General Counsel's complaint, filed January 10, added to the charge concerning the promise of a wage increase, charges that from and after September 22 respondents' officers and agents, particularly Stauble, threatened the employees with retracting the promise of a wage

2. There were four separate complaints in the charge, but only the first is of any note here. It stated:
"1. That the employer promised the workers benefits in a leaflet distributed to the workers within the past month. Such benefits include the promise of a

wage increase of 10 cents per hour for the week starting December 1st, 1966. These promises were made by the employer to interfere with union organizational activity and to interfere with the employees rights under section 7 of the Act."

increase if the employees continued to adhere to the union, and that on October 27 they posted a notice that the union was seeking to prevent the wage increase. The charge of threatening to take away the wage increase was contradicted by the notice itself, and was not established. Certain other charges made in the complaint were also not supported, and need not detain us.

After hearing, the trial examiner concluded, as an ultimate finding, that in August respondents "knew that subsequent to the expiration of the 60-day posting period. required by the Board's order * * * a rerun election would be scheduled * * * and that it was for reasons closely related to the impending employees' election that * * * the announcement of a year-end pay increase was made." He also found that the statements of Stauble and the October 27 notice regarding the union's intentions were misrepresentations seriously prejudicial to the union and to a free election, and thus supported a conclusion that the initial promise of wage increases was improperly motivated. He recommended that a section 8(a) (1) order be made as to both of these matters. The Board affirmed. Gotham Indus., 1967, 167 N.L.R.B. No. 91.[3]

We deal first with the promise of a wage increase. Board counsel conclude, "The record in this case amply warrants the Board's finding of unlawful motivation" for the wage increase, and thus satisfies the Supreme Court's holding in NLRB v. Exchange Parts Co., 1964, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435, that section 8(a) (1) "prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." We agree with the Board's acceptance from the outset of the necessity of showing improper motivation for this 8(a) (1) violation.[4] Having done so, and in light of the fact that the employer came forward with affirmative evidence of proper business justification, the ultimate burden was upon the Board to show that the promise was primarily motivated by an antiunion purpose. Jervis Corp., Bolivar Division v. NLRB, 6 Cir., 1967, 387 F.2d 107, 113 n. 4; NLRB v. Crosby Chem., Inc., 5 Cir., 1960, 274 F.2d 72, 74 n. 5; see also NLRB v. Billen Shoe Co., 1 Cir., 1968, 397 F.2d 801, 803.[5]

3. With respect to what is presently in issue, the affirmance was without opinion. We in no way criticize this practice, but for convenience we will from time to time hereafter ·speak only in terms of the trial examiner.

4. See Perl, Granting of Benefits During a Representation Election: Validity of NLRB General Rule, 18 Labor L.J. 643, 647 (1967) ; cf. Christensen and Svanoe, Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality, 77 Yale L.J. 1269, 1306 (1968).

5. This burden of proof is consistent with the latest Supreme Court rulings as to the proof of improper motivation in section 8(a) (3) violations in NLRB v. Great Dane Trailers, Inc., 1967, 388 U.S. 26, 33–34, 87 S.Ct. 1792, 18 L.Ed.2d 1027. Although improper motivation is not a required element in all 8(a) (1) violations

as it usually is in 8(a) (3) violations, the Court's rulings are applicable to the situation in this case where the Board has in effect made motivation an essential element to this 8(a) (1) violation. It seems appropriate that the grant of benefits should come within the second category established in the *Great Dane* case—conduct causing a comparatively slight harm to employee rights—and not the first category, of inherently destructive conduct. Thus, although the employer would have the .burden of coming forward with a substantial and legitimàte business justification once the Board had shown a harmful effect, the burden would remain on the Board and "an affirmative showing of improper motivation must be made." 388 U.S.· at 34, 87 S.Ct. at 1798. This means an affirmative showing that it was not the business purpose that caused the employer's action. NLRB v. Billen Shoe Co., supra.

■ Passing the exceptional employer who may raise wages out of fraternal generosity, we suppose that most non-union employers give raises for one or both of two reasons: to keep employees, old and new, in the plant, and to keep unions out. As to the latter it cannot be that every time it can be shown that an employer was seeking to stay one step ahead of unionization he was guilty of an unfair labor practice; the situation must have sufficiently crystallized so that some specific orientation exists. It would be a sorry consequence if the Labor Relations Act were to be construed as causing every nonunionized employer to think twice before initiating a wage increase lest some union should appear and claim that it had been frustrated. Cf. Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 114 (1964). At a minimum it must be that to establish improper motivation requires a showing that an employer knows or has knowledge of facts reasonably indicating that a union is actively seeking to organize, or else that an election is, to use the Board's word, impending. See Norfolk Livestock Sales Co., 1966, 158 N.L.R.B. 1595; Sigo Corp., 1964, 146 N.L.R.B. 1484, 1486; Imco Container Co. v. NLRB etc., 4 Cir., 1965, 346 F.2d 178, 180. Cf. NLRB v. Radcliffe, 9 Cir., 1954, 211 F.2d 309, 315, cert. denied Homedale Tractor & Equipment Co. v. NLRB, 343 U.S. 833, 75 S.Ct. 56, 99 L. Ed. 657. We are concerned here only with the latter alternative as there was no suggestion of any organizational activities, let alone activity that might have come to respondents' attention.

The examiner treated the issue of respondents' knowledge one way; the Board, in its argument before us, in another. We consider first the examiner's approach. He concluded that respondents "well knew that another representation election was in the offing." There was no direct evidence, however, of such knowledge, and the conclusion was exclusively an inference. Indeed, all the affirmative evidence was to the contrary. The testimony was that, prior to September 23, no one had informed any representative of the respondents that an election was still possible. Respondents' express denials of knowledge were unshaken on cross-examination. In addition, there was evidence that respondents had been informed by their counsel in May 1966, after our decision, that the likelihood of reappearance of the union, in light of its substantial defeat and the lengthy period of subsequent inactivity, was remote. Even more negative than inactivity, we would think that if in August the employees were interested in a union they would have exerted their efforts in that direction rather than in endeavoring to persuade the respondents on their own.

■ The trial examiner gave certain facts as supporting his inference of knowledge that an election was impending. The first was that the order of election was still outstanding. This, of course, was true. Whether it meant that the union was still interested after what the examiner termed a "somewhat unique" delay, and interested at that particular moment, is another matter. The second was that the delay had been due to respondents' fault. We agree as to the fault but, again, the relevancy of that to a presently active union interest seems less than inescapable. Finally, the trial examiner disbelieved respondents' witnesses, saying that their denial that they were expecting an election "strains credulity." Whether this disbelief was regarded by him as affirmative proof to the contrary we cannot be certain, but, if so, it was a violation of a fundamental principle. Janigan v. Taylor, 1 Cir., 1965, 344 F.2d 781, cert. denied 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120. In any event, we find the examiner's statement of reasons unimpressive, standing alone, and on the record as a whole even more so.

Whether because Board counsel, too, were doubtful, or merely wanted another string to their bow, they have suggested other grounds, specifically, the Board's

"well known" practice not to hold rerun elections until the termination of the posting period even though this may effectuate a delay until a court of appeals order. Asked for a reference to this practice, counsel cite the Board's Field Manual, and then concede that this manual was not available to the public until after the events in question. Next, they cite the practice of "blocking charges," by which an election "may," the word is the Board's, be postponed. Surprenant Mfg. Co. v. Alpert, 1 Cir., 1963, 318 F. 2d 396. No case has been cited for a blocking charge lasting two and a half years, and no impelling logic that, if so, the election will then be sought by the union. Finally, counsel supplement the lack of proof that such should have been anticipated by saying that if respondents had inquired of the regional director as to a coming election they would have had the answer.

We must make the all too frequent response that if counsel want to establish something they should do so at the hearing, and the examiner should find it. But, more particularly, we must criticize a claim based on what, allegedly, would have been learned (in August) from the regional director. If the issue had been respondents' negligence, the examiner, not counsel, might possibly have found it to be negligent to rely on their counsel without asking the regional director. However, the issue in wrongful motivation cases is "what the employer believed and not whether that belief was reasonable." Raytheon Co. v. NLRB, 1 Cir., 1964, 326 F.2d 471, 475. Counsel's assertion does not go beyond the latter.

While we are far from persuaded of the validity of the examiner's finding of respondents' knowledge that an election was impending, we need not rest our decision on that. Assuming a proper finding of knowledge, which is a necessary ingredient, the Board was still faced with the burden of meeting respondents' showing of a proper business purpose. See n. 5, supra. As to this the examiner, while admitting that "it is not for

the Trial Examiner to sit in judgment on Respondents' business acumen," concluded that "no *adequate* business reason was advanced for the departure from the Respondents' past practice of announcing general wage and fringe benefits at the end of the calendar year. * * * " (Emphasis supplied.)

It is true that respondents' practice was to give wage increases and other benefits near the end of the year and to announce them about a month in advance. Respondents asserted, however, three business justifications for the earlier announcement: the employee meeting demanding a wage raise, an increasing tightening of the local labor market, and the impending passage of a higher minimum wage rate. The examiner found the first factually supported but unpersuasive as a motivating factor, the second factually unsupported, and the third factually supported as well as a motivating factor, but a very minimal one. We may accept the last conclusion, but not the others. We find both the first and second reasons to be factually proven, and highly persuasive.

While agreeing that the trial examiner is the primary judge of credibility and recognizing that he may have some expertise by his experience in determining whether an employer was genuinely motivated by proffered reasons, we cannot accept his denigration of the significance of the August meeting of the employees. This meeting was, concededly, self-generated, and not an event trumped up by the respondents. Present were at least twenty-five employees (the minimum estimate was 75% of the shift, some employee witnesses put it higher) of the day shift of the major department. On the undisputed testimony, a number of employees threatened to leave if an increase was not granted. Two decided to quit without even waiting. Yet the trial examiner concluded: "In the light of the fact that at the time Respondents' joint payroll was substantially in excess of 200 employees, it seems most unlikely that the meeting in question, involving as it

did only part of one shift in one department, would cause the Respondents to accelerate the announcement of an across-the-board [6] wage increase for over 200 employees that would not become effective until the following December." Passing the fact that the first night shift was already working and could not attend without permission, we do not follow the logic that one shift would want better wages while others would not. And surely there should be some documentation for the implied assumption that the day shift, only, could be raised without producing discontent in the others. Such evidence as there was on this subject was directly to the contrary.

It is very easy for the examiner to say there was no "adequate" reason for the early announcement of the wage increase. Even with his ex post facto view of the situation, however, he makes no suggestion of what respondents were to do short of offering such satisfaction to dissident employees. If an examiner is going to exercise business judgment, he should at least offer some business alternative.

We might agree that if counsel for the General Counsel could have shown the employees' demand to have been unreasonable, respondents' motive in acquiescing might have been subject to scrutiny. No such proof was offered. On the undisputed testimony, respondents in the summer of 1966 were having serious difficulties maintaining a sufficient manpower level. Apparently in their business there was always considerable employee turnover. Respondents testified, however, that this had been causing increasing difficulties. The ex-

aminer disposed of this testimony in a single sentence. "Whereas her [respondents' office manager's] statistics on turnover indicated a high rate during 1966, on cross-examination she testified as to other data which established that turnover at the Fitchburg plant had been a continuing problem for several years and that, in fact, the rate had been even higher at Crawford in 1965 and at Gotham in 1964, than it was in 1966." Apart from the misleading implication of the totally irrelevant last clause,[7] it would have been more to the point to explain away respondents' testimony that in the summer of 1966 absenteeism and turnover were higher, while at the same time business needs were increasing. Respondents testified that in 1964 and 1965 replacements were readily available, but in 1966 machine "downtime" due to unfilled positions cost them significant orders. To corroborate management's belief in the tightening labor market in Fitchburg, respondents introduced proof of their increasing "Help Wanted" advertising costs—$9 in 1964, $96 in 1965, and $999 in 1966. If such testimony was untrue it should have been readily refutable. To dismiss it all because respondents always had turnover and absenteeism problems, and adding a reference to purely intramural fluctuations between Gotham and Crawford, is indicative of how difficult it was for the examiner to find tangible evidence favorable to the union.

■ Two other answers are suggested. The first is respondents' 1963 misconduct. Possible recidivism, however an unfortunate fact of life, is not, in our opinion, a substitute for proof that a particular act was primarily motivated

---

6. Insofar as criticism was implied by the use of this phrase, we note that an across-the-board increase had been given to another department earlier in the year. We note, also, that attracting new employees, which was one of respondents' problems, see infra, is not likely to be accomplished by a wage increase simply for senior employees.

7. The statement concerning the prior turnover rates of the two entities was irrele-

vant to the question whether other conditions existing in the summer of 1966 aggravated respondents' admittedly proven chronic turnover problems. It was even more than irrelevant to use separate statistics for Gotham and Crawford, which were a single business entity in everything but corporate structure and treated as such by the Board, when the combined statistics for the two clearly showed a constantly increasing turnover.

by a purpose to interfere with employees' rights to organize. Neither is the examiner's reference to respondents' October conduct. If what respondents did then was an unfair labor practice, a matter we will come to, that would be sufficient of itself. If it was not, all it did was show that respondents in October were anti-union. We agree that this warrants the belief that they were so oriented in August and September, but, again, a general anti-union animus, however important it may be in resolving doubtful questions, cf. NLRB v. Simplex Time Recorder Co., 1 Cir., 1968, 401 F. 2d 547, 548, n. 1, is not of itself sufficient to overcome a demonstrated substantial business purpose for a particular act. We have said this before. See cases collected in NLRB v. Billen Shoe Co., supra. If the law is that every employer who shows a business need is nevertheless subject to the ipse dixit of some trial examiner simply because it does not like unions, we are reviewing roulette, not legitimate regulation. The finding of an unfair labor practice with respect to the promise of a wage increase cannot stand.

With regard to the October 27 notice to the effect that the union was seeking to take away the wage increase,[8] the examiner stated, without discussion or explanation, that this was an unfair labor practice because it "was a misrepresentation which seriously prejudiced the Union and interfered with the rights of the employees to have a free election."

▮ Before reaching the fundaments of this ruling we pause to ask whether there was a misrepresentation at all. As the examiner pointed out, the union's charge did not in terms request that the wage promise be rescinded. However, respondents sought to offer into evidence a "Notice to All Employees" form which the Board, prior to the bringing of the formal complaint, proposed as part of a settlement. This concluded,

"WE WILL, should the above-named Union so request, rescind the wage increase granted employees effective December 2, 1966."

The examiner excluded this offer. Board counsel argue that he did so correctly, because settlement negotiations are wholly privileged. This overlooks the well-recognized exception regarding admissions of fact as distinguished from hypothetical or provisional concessions conditioned upon the settlement's completion. See generally, Wigmore, Evidence, § 1061; Factor v. Commissioner, 9 Cir., 1960, 281 F.2d 100, 125, cert. denied 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed. 2d 365. If the proposed notice was what the Board wanted, presumably it was a statement of the union's position, and admissible as such when the Board later says its position was different.[9] Its exclusion was prejudicial error.

The question remains whether we should order a new hearing to determine the truth of respondents' view that the union was seeking, by its unfair labor practice charge, to revoke the wage increase obtained by the efforts of another group of employees until it could be the negotiator, or whether the Board's position is untenable in any event. We believe the latter.

▮ The Board's decision was reached without any apparent consideration of three important matters. First, with respect to its finding that the notice interfered with a free election, we ask what has become of the Board's familiar rule that prejudice depends upon

8. Like the examiner, we do not deal separately with Stauble's October 17 statement to employee Arsenault. If this could be thought of as different in import from the October 27 notice not only was it an isolated incident, but any difference was shortly corrected by management's notice. Cf. NLRB v. Garland Corp., 1 Cir., 1968, 396 F.2d 707.

9. As a simple example, if a party says the defendant broke his arm and he would settle for so many dollars, the dollar amount would be inadmissible, but the assertion he broke his arm would be admissible if he later claimed it was his leg. Cf. Nau v. Commissioner, 6 Cir., 1958, 261 F.2d 362, 364–365.

lack of opportunity to reply in time. Ralston Purina Co., 1964, 147 N.L.R.B. 506; Pepperell Mfg. Co. v. NLRB, 5 Cir., 1968, 403 F.2d 520. On October 27 no election was even scheduled. Next we ask what has become of the companion rule that prejudice depends upon the ability of the replying party effectively to rebut the substance of the misrepresentation. See Celanese Corp., 1958, 121 N.L.R.B. 303, 307, enforcement denied 7 Cir., 279 F.2d 204, vacated and remanded per curiam 365 U.S. 297, 81 S.Ct. 689, 5 L.Ed.2d 688, enforcement denied 291 F.2d 224, cert. denied 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 189; United Steelworkers v. NLRB, D.C.Cir., 1968, 393 F.2d 661, 664; NLRB v. Trancoa Chem. Corp., 1 Cir., 1962, 303 F.2d 456, 3 A.L.R.2d 879. See, in general, Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L. Rev. 38, 82-91 (1964). We find it difficult to imagine a misrepresentation, if it was such, that could be more quickly, or more effectively, answered. All the union needed to do was publish a statement that respondents had misdescribed its position and that it was not seeking to nullify the wage increase. It has been well said in such event, "[t]he remedy is for the union to answer them, not a cease and desist order." NLRB v. TRW-Semiconductors, Inc., 9 Cir., 1967, 385 F.2d 753, 760.

So far as we can discover, the Board has never held that a statement which was immediately and fully correctable, if it was untrue, was a significant interference with an election even when one was about to be conducted. We are extraordinarily surprised that it should do so here, entirely without discussion, when the election had already been indefinitely postponed.

■■■■ There is an even more serious difficulty. Section 8(c) of the Act, 29 U.S.C. § 158(c) provides as follows.

"(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

The Board took no note of this statute. Yet it must be that the October notice was neither a promise nor a threat. A threat must relate to something over which the speaker has at least partial control. NLRB v. Teamsters etc., Local 901, 1 Cir., 1963, 314 F.2d 792, 794. The October 27 notice was merely an assertion that the union had possible power to accomplish something unpleasant; respondents threatened nothing and promised nothing except, and unconditionally, to endeavor to do what the employees wanted. Cf. Peter J. Schweitzer, Inc. v. NLRB, 1944, 79 U.S.App.D.C. 178, 144 F.2d 520, where the promise was not unconditional. Nor, likewise, could the Board contend this was a threat to do anything to coerce employees from exercising their right to file unfair labor practice charges or to unionize. Cf. NLRB v. Agawam Food Mart, Inc., 1 Cir., 1967, 386 F.2d 192.[10] In sum, the Board's decision in this matter is as unsupportable as it is unprecedented.

A decree will be entered setting aside the order of the Board.

10. Because of the lack of clarity of the trial examiner's opinion, we refuse to take this opportunity to pass upon the Board's apparent attempt to undercut the established dichotomous treatment of pre-election misrepresentations, depending upon the remedy. See Christensen, Free Speech, Propaganda and the National Labor Relations Act, 38 N.Y.U.L.Rev. 243, 275-78 (1963), an article we are pleased to cite although it greatly overstates what we held in NLRB v. Trancoa Chem. Corp., supra.