**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HUDSON TRANSIT LINES, INC.**

No. 17999.

United States Court of Appeals, Third Circuit.

Argued April 9, 1970.

Decided July 20, 1970.

William J. Avrutis, Atty., N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Peter Ames Eveleth, Atty., N.L.R.B., on the brief), for petitioner.

James H. Yauch, Jr., Yauch & Fagan, Newark, N. J. (James F. X. O'Brien, Associate Counsel, Newark, N. J., on the brief), for respondent.

Before SEITZ and ALDISERT, Circuit Judges, and LATCHUM, District Judge.

## OPINION OF THE COURT

LATCHUM, District Judge.

The National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act,[1] petitions for enforcement of its order [2] against Hudson Transit Lines, Inc. ("Hudson"). The Board found that Hudson had committed an unfair labor practice, in violation of § 8(a)(1) of the Act,[3] by imposing without adequate business justification a reduction in the salary and fringe benefit payments of all company employees after the

---

1. 29 U.S.C. § 160(e).

2. 173 NLRB No. 13.

3. 29 U.S.C. § 158(a) (1).

holding of a representation election by the company's bus operators and maintenance employees but before the certification of a bargaining representative.

Hudson is a common carrier primarily serving summer resort areas in New Jersey. Since 1950 the company's bus operators have been represented by the Transport Workers of America, Local 225 ("TWU").[4] Since 1955 there have been six successive labor contracts between the company and TWU. Each of the contracts expired in mid-January. The last labor contract in effect prior to the events forming the subject of this application expired on January 15, 1967.

By an exchange of letters dated October 24 and 26, 1966, TWU and Hudson each signified its wish to open negotiations for a new contract. On October 27, 1966, the Independent Bus Transit Union ("IBTU") wrote the company, claiming to represent employees in the bargaining unit covered by the TWU contract and asked to negotiate. On October 28, 1966, IBTU filed a representation petition with the National Labor Relations Board pursuant to § 9 of the Act.[5] After consultation and negotiation among representatives of Hudson, the Labor Board, and the two contesting unions, a representation election was held on January 9, 1967. Nine votes cast at the election were challenged. Because this challenge had the effect of delaying the certification of a bargaining representative, there was no certified bargaining agent for the employees of the company when the then existing collective bargaining agreement expired on January 15, 1967.

During the preliminary conferences in regard to the election, the company several times averted to the economic uncertainties which plagued the company, its very tight economic situation during the winter months and its desire that no delay occur in holding the election and determining the certified bargaining agent. For example, at the "informal conference" in the Board's regional office on November 10, 1966, John F. X. O'Brien, attorney for the respondent, offered to consent to an election, stating that the company "has serious economic problems" for it "counted on the summer revenues to offset [the] losses" incurred during the remainder of the year. Because of the seasonal nature of the company's business, it has operated at a profit only during June, July and August, and at a loss the remaining months of the year.[6] Under its certificate of convenience from the Interstate Commerce Commission, Hudson was obligated to furnish reasonably adequate service to the public during the year, and also keep itself in sound economic condition to render this service.

At the formal hearing on November 15, 1967, Attorney O'Brien, during off-the-record discussions, repeated that the company was most anxious that the representation issue be brought to a head as soon as possible because the labor contract with TWU would expire January 15 and the company needed assurance for its summer operations. On January 9, after the election was held, and it was apparent that challenges to certain ballots and the anticipated filing of objections to the election by IBTU would delay final resolution of the election for at least a month, President Flateman of Hudson, as he later testified "was just besides [himself]." "I told [the parties] that unless somethings (sic) were done, unless the company had the assurance that we were going to be operating in the summer that we would have to make certain economic adjustments."

---

4. In 1961, Local 225 was also certified as the bargaining agent for the company's maintenance employees.

5. 29 U.S.C. § 159.

6. For example, losses in excess of $180,000 had been absorbed during the period January 1 to June 30 in 1966 and an operating loss of over $225,000 was experienced for the period January 1 to June 30, 1967. Losses in excess of $100,000 for the period January 1 to June 30 had been experienced in three of the four years from 1963 to 1966. Losses were also incurred during the fourth quarter of the year.

On January 13, 1967, two days prior to the expiration of the contract with TWU, Hudson circulated a letter to its employees referring to the "uncertainties of the present situation" and the resultant need for economies. The company said that it would postpone decision on the necessary economies until February 5, 1967 in the hope that the "uncertainties" would be resolved, "and a new contract mutually agreed upon." With IBTU's objections to the election still unresolved, the company announced in a letter of February 2, 1967 that because of continuing uncertainties the company planned to institute on February 5, 1967 certain economies applicable to all officers and employees. The economies consisted generally of a 10% wage reduction for all employees whose gross weekly wages exceeded $100 and the elimination of company contributions to Blue Shield, Major Medical and life insurance premiums, and the elimination of all accruals for vacations and paid holidays. These economies were put into effect on February 5, 1967.

On March 31, 1967, IBTU's objections to the conduct of the election were overruled and the challenges to the ballots resolved. TWU, found to have won the election by a vote of 106 to 100, was formally certified as the bargaining agent for unit employees. Negotiations between TWU and the company for a new contract commenced on April 7, 1967. The union initially demanded restoration in full of the economies and the company refused. The company later offered to restore the economies provided (1) all terms and conditions of a renewal contract were agreed upon by May 1st and (2) the renewal contract would itself expire in January. The union refused, stating that the men had waited "too long"

for a later starting date and that the union would prefer to make the contract effective as of the date negotiations would be completed. Subsequently, on April 22, 1967, the parties executed a renewal contract covering the period May 31, 1967 to March 31, 1969. The new contract restored the vacation and paid holidays in full; the other reductions— the 10% cut in pay and the elimination of contribution to medical and life insurance—were restored only as of March 31, the effective date of the new contract and not as of February 5, the date these cuts had been made effective. The increases guaranteed to the union in the new contract were the most favorable in any contract up to that time. In accepting the new contract, however, TWU clearly indicated that it was not waiving its right to assert that the reductions were illegal from their inception.

Unfair labor practice charges were filed by IBTU on February 6, 1967 and by TWU on April 11, 1967. Both complaints charged that Hudson's imposition of the reduction in salary and benefits before the final resolution of the representation proceeding violated § 8(a) (1) and § 8(a) (3). After the filing of a complaint by the General Counsel, a hearing was held on September 21 and 22, 1967 before Trial Examiner Arthur Christopher. On December 9, 1967, Mr. Christopher died before completing his decision. The parties waived a hearing *de novo* and agreed that a decision should be made by a newly designated Trial Examiner on the basis of the record made before the original Trial Examiner. The new Trial Examiner, A. Norman Somers, designated according to this agreement, thereafter rendered a decision finding that Hudson had violated § 8(a) (1) and § 8(a) (3).[7] The Board, in approv-

7. The National Labor Relations Act, as amended, § 8(a), 61 Stat. 140, 29 U.S.C. § 158(a) (1965 ed.) provides: "It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*."
National Labor Relations Act, as amended, § 7, 61 Stat. 140, 29 U.S.C. § 157 (1965 ed.) provides: "Employees

ing the Trial Examiner's decision and order, relied only on § 8(a) (1) and did not deem it necessary to determine whether the conduct in question also violated § 8(a) (3).

The basic standards for judicial review of an unfair labor practice finding by the Board under § 8(a) (1) have been stated in National Labor Relations Board v. Burnup & Sims, Inc., 379 U.S. 21, 85 S. Ct. 171, 13 L.Ed.2d 1 (1964) and Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). In *Burnup & Sims*, the Court held that "the tendency" of the employer's conduct "to weaken or destroy" rights protected by § 7 is the controlling standard for determining a violation of § 8(a) (1). 379 U.S. 23–24, 85 S.Ct. 171. The Court further determined that finding an interference with § 7 rights, in violation of § 8(a) (1), "does not necessarily depend on the existence of an anti-union bias." 379 U.S. at 23, 85 S.Ct. at 172.[8] In Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), the Court affirmed a finding by the Board that the nondiscriminatory discharge of an employee who had solicited union membership while on company premises, for violation of a company rule against solicitation in the factory or offices of the company, constituted a violation of § 8(a) (1). The Court characterized this determination by the Board as the re-

sult of "working out an adjustment between the undisputed right of self-organization assured to employees under the Wagner Act and the equally undisputed right of employers to maintain discipline in their establishments." 324 U. S. 797–798, 65 S.Ct. 985. The Court further observed that the Wagner Act "did not undertake the impossible task of specifying in precise and unmistakable language each incident which would constitute an unfair labor practice" but left to the Board the primary responsibility for applying the Act's general prohibitory language "in the light of the infinite combinations of events which might be charged as violative of its terms." (324 U.S. 798, 65 S.Ct. 985).

Also relevant here are National Labor Relations Board v. Great Dane Trailers, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967) and N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), which identified two categories of unfair labor practices where proof of improper motive apparently is not necessary to establish a violation of § 8(a) (3). These categories were summarized by Chief Justice Warren in his opinion for seven members of the Court in *Great Dane Trailers*. First, if an employer's conduct is "inherently destructive" of important employee rights, no proof of anti-union motivation is needed and the Board can find an unfair labor practice even if the employer

---

shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment * * *."

8. The facts of *Burnup & Sims* illustrate the general principle that an anti-union motive is not necessary to the finding of an unfair labor practice under § 8(a) (1) (and that proper motive is not necessarily a sufficient defense to the charge of a

violation under § 8(a) (1)). In *Burnup & Sims*, the employer had discharged two employees who had sought to organize his plant, in the mistaken but good faith belief that the two employees intended to use dynamite to blow up the plant if the union organizing effort did not succeed. The good faith of the employer, and the business propriety of a discharge for the reasons thought to exist by the employer, were not questioned by the Board before the Supreme Court, 379 U.S. 22, n. 2, 85 S.Ct. 171. In certain limited factual situations, such as the promise of benefits by an employer before a representation election, a showing of improper motivation has been required to establish a violation of § 8(a) (1). N.L.R.B. v. Gotham Industries, 406 F.2d 1306 (1st Cir. 1969).

**1228**

introduces evidence that his conduct was motivated by business considerations. 388 U.S. 34, 87 S.Ct. 1792. Second, if the employer's conduct could have adversely affected employee rights to some extent the employer must establish that he was motivated by legitimate objectives. 388 U.S. 34, 87 S.Ct. 1792. If the employer does not establish the required "legitimate and substantial business justifications" for his action, the conduct constitutes an unfair labor practice "without reference to intent." 389 U.S. 380, 88 S.Ct. 543.

The articulation of these two categories of § 8(a) (3) violations in *Great Dane Trailers* and *Fleetwood Trailer* seem to reflect and to particularize principles which the Court has recognized in evaluating violations under § 8(a) (1), where proof of motive generally has not been necessary.[9] The clearest statement of the basic inquiry required under both § 8(a) (1) and § 8 (a) (3) is Justice White's opinion in N.L.R.B. v. Erie Resistor Corp., 373 U.S.

221, 83 S.Ct. 1139, 10 L.Ed.2d 308. In attempting to correlate the inquiry into motive under § 8(a) (3) with the weighing of "conflicting legitimate interests," without regard to motive, under § 8(a) (1), Justice White stated that "preferring one motive to another is *in reality* the far more delicate task, reflected in part in decisions of this Court, of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct." 373 U.S. 228, 229, 83 S.Ct. 1145–1146 (emphasis added). In so describing the basic reality of the inquiry in both § 8(a) (1) and § 8(a) (3) in *Erie Resistor,* Justice White relied on certain decisions of the Supreme Court which had recognized the necessity of the evaluation of conflicting legitimate interests without regard to motive.[10]

9. Courts and commentators have noted that the Supreme Court's approach to § 8(a) (1) and (3) "is presently in a state of flux" Lane v. NLRB, 418 F.2d 1208, 1209 (D.C.Cir. 1969). Christensen & Svanoe: Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality: 77 Yale L.J. 1269 (1968). In NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) and American Ship Bldg. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) the Supreme Court accorded considerable weight to the factor of motive in establishing a violation under § 8(a) (3). "We have determined that the 'real motive' of the employer in an alleged § 8(a) (3) violation is decisive * * *." 380 U.S. 287, 85 S.Ct. 985–986. *Great Dane Trailers* and *Fleetwood Trailer*, however, seem to indicate a more flexible, and integrated approach in evaluating alleged violations of § 8(a) (3) and § 8(a) (1). Lane v. NLRB, *supra*, 418 F.2d at 1211. Christensen & Svanoe, supra, at 1330–31.

10. In this quoted portion of his opinion for the Court in *Erie Resistor,* Justice White referred in a footnote to four decisions of the Supreme Court: NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333,

58 S.Ct. 904, 82 L.Ed. 1381 (1938); Republic Aviation Corp. v. NLRB, *supra*; NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956); NLRB v. Truck Drivers Local Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957) (*Buffalo Linen*). *Mackay Radio & Telegraph* recognized that a single employer's interest in continuing operations during a strike by hiring permanent replacements must be held to outweigh the employees' interest in making the strike effective. *Republic Aviation* clearly established, in the context of § 8(a) (1) violation the primary responsibility of the Labor Board for the weighing of competing legitimate interests in light of the "infinite combination of events" which might be charged as violative of the Act. In Labor Board v. Babcock & Wilcox, the Supreme Court, while recognizing that access of nonemployee organizers to company property is not governed by the same legal standard as the activity of employee organizers (thereby distinguishing *Republic Aviation, supra*) nevertheless recognized that the application of more restrictive legal standard of nonemployee union organizers still had to take account of the balance of employee and employer interests. As the Court stated: " * * * [I]f the location of a plant and the liv-

It is this basic insight of Justice White in *Erie Resistor* concerning the actual nature of the inquiry under both § 8(a)(1) and § 8(a)(3) which is reflected in the articulation in *Great Dane Trailers* and *Fleetwood Trailer* of the two categories of § 8(a)(3) violations which do not require proof of motive. Because *Erie Resistor, Great Dane Trailers* and *Fleetwood Trailer* reflect a substantial integration of approach in the evaluation of unfair labor practices under § 8(a)(1) and § 8(a)(3), these § 8(a)(3) decisions should be looked to as providing

standards relevant to evaluating the finding of an unfair labor practice under § 8(a)(1) in the present case.[11]

In light of the above standards, the first inquiry for the Court is to determine whether the Board's findings concerning the impact of the challenged employer conduct is supported by substantial evidence. At the outset, it must be noted that the Board's finding concerning the extent of the impact of that employer's conduct is not fully clear. At one point, the Trial Examiner adopted the position of the General Counsel that the

ing quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property." (351 U.S. 113, 76 S.Ct. 685). The Court found, however, that no such limiting conditions had been demonstrated in the case before it. In *Buffalo Linen*, the Court upheld the propriety of a lockout by a group of employers to preserve the integrity of a multi-employer bargaining unit. While recognizing that the Act protects "the right of employees to strike" the Court concluded that "this protection is not so absolute as to deny self-help by employers when *legitimate interests* of employees and employers collide. Conflict may arise, for example, between the right to strike and the interest of small employers in preserving multi-employer bargaining as a means of bargaining on an equal basis with a large union and avoiding the competitive disadvantages resulting from nonuniform contractual terms. The ultimate problem is the balancing of the *conflicting legitimate interests*. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review. (353 U.S. 96, 77 S.Ct. 647–648, emphasis added).

11. The Court in Lane v. NLRB, *supra*, concluded that in light of *Great Dane Trailers* and *Fleetwood Trailer*, the Supreme Court had established "two categories of Sections 8(a)(1) and 8(a)(3) violations which do not require proof of antiunion animus." 418 F.2d 1208, 1211. The analysis here is an essential agreement with the conclusion reached by the Court of Appeals in Lane v. NLRB, *supra*. In NLRB v. Gotham Industries,

406 F.2d 1306, *supra* n. 8, the Board found that the promise of an increase in wages before the holding of a representation election had interfered with the employees' right to self-organization under § 8(a)(1). To establish that the promise of benefits constitutes a violation of § 8(a)(1), improper (antiunion) motive must be established. In reviewing the determination of the Board, Judge Aldrich, finding *Great Dane* relevant, concluded that because the harmful effect of the promised pay increase was "comparatively slight" and because the employer had demonstrated "substantial and legitimate business justification" for promising the increase in wages, the burden remained on the Board to make out "an affirmative showing of improper motivation." 406 F.2d 1306, 1309 n. 5. This reading of *Great Dane* in *Gotham Industries* is consistent with the analysis of the Court here and that of Judge Wright in Lane v. NLRB, *supra*, as applied to the first two categories of unfair labor practices recognized in *Great Dane*. Judge Aldrich in *Gotham Industries* was concerned with the third category of violation envisaged in *Great Dane* where the adverse effect of the employer's conduct is at least comparatively slight and the employer has come forward with evidence of legitimate and substantial business justifications for his action. Judge Aldrich's implicitly recognized that if the adverse impact of the employer's conduct is at least comparatively slight, proof of an antiunion motive is necessary only if the employer has met his burden of establishing "legitimate and substantial business justifications" for his action. If the employer has not demonstrated "legitimate and substantial business justifications" the conduct constitutes an unfair labor practice "without reference to intent." *Fleetwood Trailer*, *supra*, 389 U.S. at 380, 88 S.Ct. at 547.

"loss in earnings and benefits because of representation proceeding that was still pending 'could effectively inhibit any change by employees of their bargaining representative.'" The Trial Examiner further stated: "Unexplained, the conduct as of the time it occurred offended the employees' rights, protected by the Act, to engage in a representation proceeding * * *" There was no explicit finding by the Trial Examiner or the Board that the employer's conduct was "inherently destructive" of employee rights protected by the Act. On the other hand, the underlying premise of the Trial Examiner's decision was that the employer's reduction in salary and fringe benefits was at least "comparatively slight" within the standards of *Great Dane* and *Fleetwood.*

■■ After a review of the entire record, this Court is of the opinion that the impact of the reduction in salary and fringe benefits at least had the "potential for adverse effect upon employee rights," *Great Dane Trailers,* 388 U.S. 26, 35, 87 S.Ct. 1792, 1798, and, therefore, required the employer to come forward with an adequate justification of his conduct.[12]

At the time the reduction in salary and other employee benefits were imposed, the prior collective bargaining agreement had expired. The unresolved status of the election left the employees without a representative qualified to engage in collective bargaining on their behalf.[13] If such a unilateral reduction had been imposed, during the negotiations of a collective bargaining agreement but before impasse, the employer's conduct clearly would have been an unfair labor practice. N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). The potential for adverse impact in the employer's conduct here is not the rebuke to the process of collective bargaining involved in a unilateral change in salary during negotiations. Rather, it is the indication to employees that by engaging in a representation proceeding, and incurring the risk that an unresolved election may leave the employees temporarily without a representative, the employees will for that period be vulnerable to a reduction in salary and other benefits through the unilateral action of the employer. Because of the employee recognition of this vulnerability to serious reduction in economic benefits during the period when a representation election remains unresolved, the Board was justified in concluding that "employees would tend to think twice before again engaging in a representation proceeding."

Because we agree with the conclusion of the Board that the employer's imposition of economies before the resolution of the representation election "could have adversely affected employee rights to some extent" it is thus necessary to consider whether the employer has come forward with evidence of "legitimate and substantial business justifications" for his action. *Fleetwood Trailer, supra,* 389 U.S. p. 380, 88 S.Ct. 543, *Great Dane Trailers, supra,* 388 U.S. p. 34, 87 S.Ct. 1792.

12. Section 7 provides, *inter alia,* that employees shall have "the right to self-organization, to form, join or assist labor organizations [and] to bargain collectively through representatives of their own choosing." Clearly "the right to self-organization" and the right "to bargain through representatives of their own choosing" encompasses .the right of employees to choose their representatives openly and freely.

13. The unresolved status of the election also left the employer without authority to recognize or to negotiate with either of the competing unions. An employer who recognizes or bargains collectively with one of two competing unions is guilty of an unfair labor practice without regard to his motivation. Midwest Piping & Supply Co., 63 N.L.R.B. 1060 (1945). As subsequently revised and stated in Shea Chem. Corp., 121 N.L.R.B. 1027 (1958), the *Midwest Piping* rule holds that "upon presentation of a rival or conflicting claim which raises a real question concerning representation, an employer may not go so far as to bargain collectively with the incumbent (or any other) union unless and until the question concerning representation has been settled by the Board." *Id.* at 1029.

The basic justification offered by Hudson for instituting the challenged economies was that the unresolved status of the election in January and February of 1967, and the consequent uncertainty concerning when negotiations would begin and successfully be concluded, left the Company with "no assurance" of operations during the crucial summer months and, therefore, required the reduction of expenditures to the level of current revenues—in the c o m p a n y 's words, required cutting "the suit to the cloth."

█ Hudson first claims that its decision to institute economies "was a matter peculiar to management prerogative" and as such, could not be questioned by the Board. In support of this extreme position, the Company relies on Textile Workers Union v. Darlington Manufacturing Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed. 2d 827 (1965). This reliance is seriously misplaced. In *Darlington*, the Supreme Court upheld the right of a company to go out of business in order to avoid the unionization of the employees of the plant. This recognition of a right of "industrial suicide" in *Darlington* has little relevance to the situation here, where an ongoing concern imposed drastic reductions in the salaries and fringe benefits of all employees, before the resolution of a representation proceeding, when the employees were without a representative to protect their interests t h r o u g h collective bargaining. We, therefore, feel *Darlington* is inapposite and are not in any way persuaded to extend the scope of *Darlington* beyond the narrow and unusual factual situation there involved.

Further, the company has not contended, or offered any case which indicates, that the institution of economies "in face of union negotiating demands but before impasse" is a matter peculiar to management prerogative. If it is not a matter of exclusive management prerogative to institute economies while negotiations are in progress, there seems no reason for finding such a prerogative to institute economies "in the face of a representation proceeding" when there is no representative with whom to conduct negotiations.

Hudson further contends that even if the institution of economies was not justified as a matter "peculiar to management prerogative," the need to make current operating expenses meet current revenues, because of the lack of assurance of summer operations, constituted "legitimate and substantial" business justification for the company's conduct. The Board found that the possibility of a strike in July or August was a remote and tenuous possibility which was "not commensurate with" and which, therefore, did not justify the drastic character of the company's action on February 5 and the overwhelming probability of its effect on employees' rights when the action was taken.

█ In reviewing this determination by the Board, it must be recognized that it is the primary responsibility of the Board and not of the courts "to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." 389 U.S. 378, 88 S.Ct. 546. In *Erie Resistor*, the Court recognized the special function of the Board in applying the general provisions of the Act to the complexities of industrial life and of "[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases" from its special understanding of "the actualities of industrial relations. * * * 'The ultimate problem is the balancing of the conflicting *legitimate* interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board subject to limited judicial review.'" 373 U.S. 236, 83 S.Ct. 1150.

█ After a full consideration of the record—the weight of the evidence and convincing quality of the reasoning supporting the conclusions of the Board—

we feel that the Board properly concluded that the adverse impact of the economies clearly outweighed the business justification for the economies offered by the employer. The Board's determination was faithful to the governing precedents, and supported by substantial evidence. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

██ The Board, having found that the Company withdrew and reduced employee benefits in violation of the Act, directed the Company to make whole all employees for losses sustained to the extent it had not already done so. Before the Board, the Company complained that the remedy was couched in general terminology, ambiguous and indefinite. But it is well settled that the Board is justified in framing its order in general terms and leaving the working out of the details to the subsequent compliance proceedings.[14] Such a rule is particularly salutary where, as here, the record does not disclose the extent to which, if at all, the Company may have restored to the non-unit employees the benefits which it eliminated or reduced on February 5.[15]

██ Hudson also objects to the scope of the order, contending that the Board improperly extended the make whole remedy to employees not within the bargaining unit. But it is clear that these employees, as well as those within the unit, were deprived of substantial economic benefits because the latter group had engaged in protected activity. Since the Company chose to extend its unlawful conduct to non-unit employees, it is hardly in a position to complain that these employees are to be made whole for the losses visited upon them as a result of such conduct. Cf. N.L.R.B. v. Zelrich Company, 344 F.2d 1011, 1014 (5th Cir. 1965).

██ The Board's remedies for unfair labor practices will be upheld as valid if reasonably "adapted to the situation which calls for redress."[16] The Board directed that all employees be made whole because "[o]nly thus can there be a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal [conduct]." Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). It follows that the Board's order is reasonable and valid and will be ordered enforced.

---

14. N.L.R.B. v. C.C.C. Associates, Inc., 306 F.2d 534, 539 (2d Cir. 1962); Nathanson v. N.L.R.B., 344 U.S. 25, 29, 73 S.Ct. 80, 97 L.Ed. 23 (1952); N.L.R.B. v. Local 776, IATSE (Film Editors), 303 F.2d 513, 521 (9th Cir. 1962), cert. den., 371 U.S. 826, 83 S.Ct. 47, 9 L.Ed.2d 65.

15. As to employees within the bargaining unit, the Company did not restore the 10 per cent pay cut and elimination of its contributions for health and life insurance for the period between February 5 and March 31, the effective date of the new contract.

16. N.L.R.B. v. Mackay Radio & Tel. Co., *supra.* Accord: Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); N.L.R.B. v. Strong, 393 U.S. 357, 358–359, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); N.L.R.B. v. Gissel Packing Co., Inc., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Leeds & Northrup Co. v. N.L.R.B., 391 F.2d 874, 879–880 (3rd Cir. 1968); J. P. Stevens & Co., Inc. v. N.L.R.B., 417 F.2d 533 (5th Cir. 1969).