**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CROSBY CHEMICALS, INC.,**
Respondent.

No. 17613.

United States Court of Appeals
Fifth Circuit.

Jan. 20, 1960.

---

Fannie M. Boyle, Atty., Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Jerome D. Fenton, Gen. Counsel, Hans J. Lehmann, Atty., N. L. R. B., Washington, D. C., for petitioner.

Karl H. Mueller, Fort Worth, Tex., Hall & Callender, Columbia, Miss., Mueller & Mueller, Fort Worth, Tex., Toxey Hall, Bernard Callender, Columbia, Miss., Harold E. Mueller, Fort Worth, Tex., for respondent.

Before CAMERON, JONES and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

The National Labor Relations Board has filed this petition to enforce its order of August 11, 1958 [1] against Respondent Crosby Chemicals, Inc., a Mississippi corporation operating naval stores plants at Picayune, Miss. and at DeRidder, La. Robert H. Crosby, Sr. was chairman of Respondent's board of directors and its principal stockholder, and he had general charge of the Picayune plant. Robert H. Crosby, Jr., was president and Tommie Crosby was vice-president and was manager of the DeRidder plant.

In the latter part of July, 1956, these officers obtained knowledge that the International Chemical Workers Union, AFL-CIO, had begun an organization campaign in Respondent's two plants. August 27, 1956, the Union wired Respondent that a majority of the production and maintenance employees in the Picayune plant had authorized the Union to represent them for the purpose of collective bargaining and requesting recognition, following which a consent election was held in each of the plants December 6, 1956. The Union won the election in the Picayune plant and was certified December 14, 1956 as the bargaining agent for that plant. It lost the election at the DeRidder plant.

The Union filed a series of charges, six in number, charging that Respondent had violated various sections of the National Labor Relations Act [2] upon which on June 4, 1957 the Regional Director of the Board in New Orleans, La. filed a consolidated complaint against Respondent. The complaint embraced all of the charges, specifying twenty-five particulars in which various sections of the Act had been violated by R. H. Crosby, Sr., Tommie Crosby, and several of the supervisory employees. Respondent filed an answer denying generally the charges of violation contained in the complaint, and the case was heard by a Trial Examiner between July 9th and 17th, 1957, who filed his Intermediate Report October 22, 1957. Both parties filed detailed exceptions to the Examiner's report, that of the General Counsel specifying forty-four separate instances in which it was claimed that the Examiner erred either in his findings based on disputed evidence, or in the inferences and conclusions he had drawn from the evidence. Respondent also filed itemized exceptions to the Examiner's report, and the matter came on for hearing before a three-judge panel of the Board, which filed its opinion and entered its order August 11, 1958.

In the meantime Respondent had filed a motion to reopen the record so as to

---

1. 121 N.L.R.B. No. 51.

2. These were dated August 31, 1956, September 4, 1956, December 17, 1956, December 26, 1956, January 23, 1957, and April 11, 1957.

show that, in January, 1958, it had concluded a written contract with the Union. A copy of the contract was attached as an exhibit to the motion, along with a letter announcing the payment of a bonus to the employees of the Picayune plant corresponding to the bonus which had been paid to the employees of the De-Ridder plant. The General Counsel had introduced into the record as an exhibit, a letter dated May 25, 1957 in which Respondent had offered the Union to pay the Picayune employees the same bonus it had paid to those employed at the De-Ridder plant.

The Examiner analyzed the evidence in meticulous detail and resolved the great majority of the testimonial conflicts in favor of the Crosbys and their supervisory employees.[3] He found in favor of the General Counsel's testimony with respect to four pre-election violations: (1) that Maintenance Superintendent Manberg exhibited a document to two employees "wherein he clearly sought to leave the impression that if the Union came into his plant wages would be cut to the alleged Union scale shown in the document;" (2) that Foreman Taylor stated to employee Lumpkin that if the Union came into the plant, Lumpkin would not be able to hold his job as a pipe fitter without serving out the res-idue of his apprenticeship; (3) that Tommie Crosby stated to employee Wise [4] "to the effect that the bonus was not being paid because of the organizational effort of the Union among the Respondent's employees;" and (4) made a similar statement to employee Williams.

Based upon these findings and upon his conclusion that the two bonuses per year had been continued without interruption so long that they amounted to nothing more than additional wage payments, the Examiner concluded that Respondent had violated the Act by withholding the payment of a summer bonus at each of the plants and by withholding the payment of the December bonus at the Picayune plant; and that in the "discrimination * * * and coercing employees in the rights guaranteed in § 7 of the Act, as herein found, the Respondent has engaged in and is engaging in unfair labor practices within the meaning of § 8(a) (1) of the Act." [5] The Examiner recommended the entry of the usual cease and desist order and that it embrace the payment of the omitted bonuses.

Upon the hearing before the Board all of the rulings of the Examiner were affirmed except those specifically excluded. The Board disagreed categorically with the Examiner's ruling on the Taylor-

---

3. For example, a number of the employees stated that R. H. Crosby, Sr. and Tommie Crosby, or one of them, had stated in one of the meetings which they had held with the employees that the bonus checks for the summer of 1956 had been made up, but were being withheld pending a demonstration of the attitude of the employees; that the plant was put together with bolts and could be taken down easily; that expansion of the plant would be determined by the attitude of the employees in the election; that the employees were making a mistake in negotiating with a union; that if a union were organized, their insurance would be jeopardized; and that they had made checks on the union meetings and knew who had attended. The two Crosbys denied all of these statements, and the Examiner credited the Crosbys against all of the rest of the witnesses. The same is true as to some statements at-tributed to Manberg, a supervisory employee.

4. There is confusion in the Examiner's report—which the Board sought to clear up—as to whether this statement was made to Wise, or to Williams, or to Willis.

5. In commenting upon the testimony of Respondent's officials, the Examiner remarked that it "is not at all persuasive to the undersigned." The burden of persuasion was, of course, not upon Respondents but upon the General Counsel. N.L.R.B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 411. What the Court of the Sixth Circuit said in N.L.R.B. v. Cleveland Trust Co., 1954, 214 F.2d 95, 99, is applicable here: "But the burden of proof rests not upon the bank to convince the Board that the raise was not in violation of the Act but upon the Board to prove that the raise was illegal."

Lumpkin conversation. According to Lumpkin, Foreman Taylor had shown him a contract "that the Union apparently had with another company and told him that, if the Union was voted in, wages would be cut to conform to those in the contract;" he also testified that Taylor expressed the opinion that Lumpkin would be forced to complete his four years apprenticeship if the Union should win. The Board rejected the conclusions of the Examiner.[6] In so doing, it called attention to the fact that Taylor had testified "that Crosby, Sr. had given the foremen a sheet of paper showing the wage scale of a competitor company and told them just to show it to the employees."

■ The Board's ruling on this incident, coupled with the fact that neither the Examiner nor the Board failed to credit the statements made by R. H. Crosby, Sr., necessarily disposes of the finding "that Maintenance Superintendent Charles Manberg exhibited the same wage scale to employees Eldridge and Holston * * * wherein he clearly sought to leave the impression that if the Union came into his plant wages would be cut to the alleged union scale shown in the document." Responding to a leading question, Manberg had expressed the opinion that the employees' wages would be reduced to the union scale in effect in another plant if the Union won the election.[7] Manberg denied making the statement quoted in the note, but testified, as all others did, that the wage scale in the competing plant was given to the foremen with instructions to show it to the employees, but "not to threaten them their wages would be cut." The Examiner really treated Manberg's statement as an expression of opinion, but found nevertheless that what he did was a violation of the Act.[8] Undisputedly, Manberg had nothing to do with the fixing of wages, had authority only to show the wage scale to employees, not to comment upon it; and, at most, what he said could not be, and was not, construed as anything more than the expression of his opinion. This episode should have been handled by the Board in the same manner as that involving Taylor and Lumpkin. In any event, everything said and done in both comes under the protection of 29 U.S.C.A. § 158(c):

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

The Board disagreed with the Examiner also with regard to the testimony of employee Willis as to what Respondent's representative said at a meeting between

6. Here is the Board's language:
"The Trial Examiner credited Taylor's denial and found that he had not told Lumpkin that wages would be cut if the Union was voted in. As to the apprenticeship issue, * * * We believe Taylor was merely expressing his personal opinion in the nature of a prediction that because the Union had stricter journeyman requirements than did the Respondent it might attempt to secure a longer apprenticeship period for pipefitters * * * We find that such statement was protected by Section 8(c) and is therefore not violative of the Act."

7. "He pointed it out, took his finger and run across that way and indicated carpenters, $1.84. I said, 'Charlie, you mean that would be my wages if the union goes in?' He nodded his head and said, 'That's right.'"

8. "Of course Patch did not testify that Manberg told him wages would be cut in the event of unionization, he merely testified that Manberg nodded and said 'that's right' when Patch remarked 'Charlie, you mean that would be my wages.' This may be interpreted as a mere expression of opinion, the auditor being left to draw his own conclusion, however on the record considered as a whole the undersigned is persuaded that Manberg exhibited the wage scale to Patch in such a manner as to inevitably create the impression that bringing the Union and a union wage scale into the plant would result in a wage cut. The undersigned so finds."

management and the employees,—that "the Respondent would not pay the summer bonus to its employees because the organizational activities of the Union prevented it from making such payment." Since Tommie Crosby testified that he talked with Willis and told him merely "that the Respondent never intended to pay the summer bonus," the Board found, from a "complete failure of proof," that "Tommie Crosby did not state to Willis that the Respondent withheld the summer bonus because of the Union's organizing activities."

■ The Examiner found that Tommie Crosby had made a similar statement to employees Williams and Wise. The Board did not agree with the Examiner as to Wise.[9] Assuming that the finding as to Williams was approved by the Board, it is clear that such an approval would have no more basis in substance than the others which it rejected. Moreover, even if Tommie did say to Williams that "He came back and found himself in the middle of a hornet's nest and couldn't, that he couldn't fire me, give me a raise or nothing without violating the Labor Law," he was on solid ground. The determination not to pay the summer 1956 bonus had been taken in June, while the statements attributed to Tommie were made in September and November. If, after the Union had notified Respondents of its organizational activities (August 27th), and had petitioned the Board for recognition as bargaining agent, Respondent had changed its mind and paid the bonus, it is clear that such action would have been made the subject of an unfair labor charge. The Union had, at that time, already filed two formal

charges against Respondent, thus putting Respondent on notice that it would take advantage of every move made by it which could possibly form a basis for a charge under the Act. It is plain, also, that Tommie's statements come clearly within the purview of § 8(c) of the Act quoted supra.

■ The main battle before us has revolved around the two omitted bonus payments and the finding of the Trial Examiner approved by the Board; "As to the merits, we find, like the Trial Examiner and for the reasons stated by him, that the Respondent in 1956 *withheld the summer bonus* at Picayune and DeRidder *in order to discourage union activity;*" [emphasis supplied] and its further finding that the failure to pay the December bonus at Picayune "had the inherent effect of discouraging Union membership and therefore constituted a violation of the Act, even absent any anti-union motivation." We have referred in detail to the evidence and the circumstances upon which the Examiner and the Board based their conclusions because we think that they are not sufficient to raise a substantial issue of fact when weighed against the undisputed testimony of the witnesses.

■ All three of the Crosbys testified unequivocally that, at a meeting held on June 4th and 5th, 1956, they decided that the customary summer bonus would not be paid.[10] This determination was taken because the preliminary audit for the first half of the fiscal year, ending May 31, 1956, showed a net loss of more than a half million dollars; and because the officers had been advised that a competitor was at the point of raising wages

9. Here is its language: "In setting forth the testimony of Ranel B. Williams, the Trial Examiner inadvertently found that Wise instead of Williams testified as to certain events. We hereby correct this error, which does not affect the findings and conclusions herein."

10. It is intimated that this testimony is subject to discount because it was not shown that the directors made a formal entry of this determination in the minute book. Written minutes are not required under Mississippi law, Burnett's Lumber & Supply Co., Inc. v. Commercial Credit Corp., 1951, 211 Miss. 53, 51 So.2d 54, 58, nor under the general law, 13 Am. Jur., Corporations, §§ 166 and 948 (referred to and quoted by the Mississippi Court), and 19 C.J.S. Corporations § 751, pp. 96–97. This principle would find almost universal adherence and application to the actions of family corporations such as Respondent is.

substantially, requiring that Respondent do likewise in order to hold its employees. The wage raise was made August 4th, prior to the time the Union had advised Respondent that it held cards signed by a majority of the Picayune employees. It is conceded that nobody connected with the Respondent had heard of any actual or prospective union activity until the latter days of July. Each of the Crosbys testified positively that the decision to omit the summer bonus was made long before they had any intimation of union activity or the prospect thereof, and that the decision and the subsequent omission of the bonus were not brought on by, and had no connection with, the union activity. In fact, the only tangible evidence was that the omission of the summer bonus was a main factor in provoking organizational effort.

There was no showing of any statements or actions on the part of Respondents manifesting anti-union bias, the only thing approaching such a showing being the admission of R. H. Crosby, Sr. that he was antipathetic to the particular Union engaged in the organizational activities mainly because of his resentment against one of the organizers who he felt had made false statements about Respondent—an attitude which had its birth about the middle of September. Moreover, it is not claimed that he was guilty of any violations of the Act.

The summer bonus had been regularly paid about August of each year for a period of ten or more years. But the amount of the bonus and the factors weighed in fixing it were matters considered and acted upon solely by the employer. There was no testimony that the payment of the bonus had ever been the subject of agreement between the employer and the employees or any one

of them, or that any employee had ever taken the position that he was entitled to the bonus as a matter of right.

Soon after the time for the election was agreed upon the Respondent posted throughout its plant, where they remained from September 19th until the time of the election, bulletins [11] formally notifying the employees that they would not be penalized or discriminated against in any way if they favored the Union; and in every speech which was made and in every statement appearing in the evidence the same attitude was taken. The Union won the election at the Picayune plant and the Respondent began negotiations with it, which resulted in a contract agreeable to both sides. No claim has been made that management has not cooperated fully in its bargaining and other dealings with the Union.

With respect to the Christmas bonus, it is undisputed that the employees at the DeRidder plant were paid a bonus on December 20th, and that Respondent consulted its regular attorney about paying the bonus at the Picayune plant expressing the desire to pay it if it could do so legally. The attorney advised that, since the Union had been certified as bargaining agent on December 14th, it could not be paid unilaterally, but must be the subject of bargaining with the Union. Respondent acted on this advice, as it had a right to do, and it frankly stated also that the bonus would be used as a talking point in its negotiations with the Union. It is significant that Respondent made, before the complaint was filed, a written offer to bargain with the Union concerning bonuses and to pay the Picayune employees the same bonus as that it had paid to the DeRidder employees. The Union did not reply because it felt that

11. " * * * You do not have to join or belong to any union in order to hold your job.

"You have the right to join a union if you want to join. You also have the right not to join if you do not want to join.

"Under the law you cannot be forced to belong to a union in order to keep your job. You will not be discharged because you do not belong to a union or because you do belong. . . .

"We will not permit any discrimination either for or against you because you belong or do not belong to a union."

its status in the litigation it was then preparing might be prejudiced thereby.[12]

■■ As to the summer bonus, therefore, the Board's finding "that the Respondent in 1956 withheld the summer bonus at Picayune and DeRidder in order to discourage union activity" requires a complete rejection of the testimony of the three Crosbys that the withholding of the bonus was agreed upon before they had any hint of possible union activity, and that its nonpayment had no connection whatever with union activity. This is another instance where the Board has gathered together circumstances it considers suspicious and accepted them in the face of positive testimony given by reputable and unimpeached witnesses.[13] Our decisions have made it abundantly clear that the Board cannot legally do this, but must base its findings on substantial evidence. N. L. R. B. v. Drennon Food Products Co., Nov., 1959, 272 F.2d 23; N. L. R. B. v. Ferguson, 5 Cir., 1958, 257 F.2d 88; N. L. R. B. v. McGahey, supra; N. L. R. B. v. Ray Smith Transport Co., 5 Cir., 1951, 193 F.2d 142; and N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 1941, 122 F.2d 433. We hold, therefore, that neither the isolated episodes discussed in the Board's opinion and analyzed supra nor the failure to pay the summer bonus constituted unfair labor practices under the Act.

■■ We reach the same conclusion as to the Christmas bonus at Picayune.

This was a matter about which management was obliged to bargain with the Union representatives, cf. N. L. R. B. v. Fant Milling Co., 1959, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243, and there is no showing that the Union made any effort to bring up the question before Christmas. It was content to make the bonuses subjects of charges filed many weeks thereafter. We do not agree with the Board's findings with regard to the Christmas bonus or the reasons upon which they are based. It is clear from the only evidence in the record that the nonpayment of the bonus rested solely upon sound legal advice; that Respondent offered to pay it as soon as the Union would work out the details with it; and that it did pay the bonus pursuant to its standing offer.

The Petition for enforcement of the Board's Order is Denied.

JOHN R. BROWN, Circuit Judge (concurring specially).

I concur in the result and in much of the able opinion of my Brother CAMERON. I doubt, however, that the statements characterized as coming within § 8(c) of the Act, 29 U.S.C.A. § 158 (c), and therefore held as exempt by the Court, are really such. And I also consider that the opinion seems to give an undue weight as a matter of law to opinions and recommendations of the employer's counsel.

---

12. In a Supplemental Transcript of Record Respondent includes a motion to reopen the record filed with the Board several months before the case was decided by it. With the motion were exhibited documents showing that this offer to pay the Christmas bonus had been carried out under agreement with the Union and that the negotiations had resulted in the execution of a written agreement between Respondent and the Union covering all phases of their relationship—and not providing for payment of any bonuses. Cf. Fant Milling Company case, infra.

13. Both the Examiner and the Board accepted all of the testimony given by R. H. Crosby, Sr., although it was disputed by a number of witnesses. The testimony of Tommie Crosby was accepted against contradicting witnesses in almost every instance, and the veracity of R. H. Crosby, Jr. has not been questioned at all.