**LITTON DENTAL PRODUCTS, DIVISION OF LITTON INDUSTRIAL PRODUCTS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 75–2239.**

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1976.

Decided Nov. 3, 1976.

Francis X. Dee, for petitioner.

Robert G. Sewell, Atty., N.L.R.B., Washington, D.C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Michael K. Schmier, Atty., N.L.R.B., Washington, D.C., on brief, for respondent.

Before BRYAN, Senior Circuit Judge, CRAVEN, Circuit Judge, and J. CALVITT CLARKE, Jr., United States District Judge.*

ALBERT V. BRYAN, Senior Circuit Judge:

Enforcement of the National Labor Relations Board's decision and order of November 14, 1975, finding Litton Dental Products, Division of Litton Industrial Products, Inc., of Brookpark, Ohio, in breach of Section 8(a)(1), NLRA, 29 U.S.C. § 158(a)(1), will be denied.[1] The judgment was entered on the Board's complaint that Litton had engaged in an unfair labor practice in that it interfered with its employees' rights by attempting to disarm and stall an on-going Union organizing drive by removing the causes of the employee grievances and promising still further relief.[2]

The nub of the charge is that recently having failed to allow two daily "coffee breaks" and certain telephone privileges, the employer, only five days after the Union's demand for recognition, reinstated these indulgences and invited employees, with assurance of remedies, to report to

---

* Sitting by designation.

1. 221 NLRB No. 98. Jurisdiction here rests on the fact of Litton's transaction of business in this Circuit. Sections 10(e) and (f), NLRA, 29 U.S.C. § 160(e) and (f).

2. The charging party was the Warehouse, Industrial & Service Employees' Union, Local 752.

management whenever they felt wronged. Over the dissent of one member, the Board sustained the complaint and ordered the employer to cease and desist in any kind of union discouragement.

With the dissenter, we conclude that the Board's decision and order were entirely lacking in the substantial support in the evidence that is indispensable to Board action. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Quite clearly, correction of the employer's derelictions was not initiated in a critical period of union organization. Improvement had begun, was afoot and well on the way to consummation prior to the appearance of any prospect of unionization. This is the decisive fact in the case.[3] It utterly shatters all suggestion of an intent to thwart, as forbidden by Section 8(a)(1), its employees' joining a union.

The testimony is free of party differences. It discloses that in September and early October 1974, the company became apprehensive of employee morale when about half of its total of 13 employees had, without explanation, left their jobs since September 6, 1974. Three had not reported for work on October 4, 1974. Manager of Retail Distribution and Sherry became convinced that the turnover was abnormal and due to the inaptitude of the local manager, one Frick, in executing company policy. His removal was decided upon immediately and on October 10 a successor, William Havas, chosen. Inquiry disclosed also that the company's wage scale was below the standard in Brookpark.

The Vice President of Employee Relations, Robert Byram, went to the facility on October 14 to investigate the supervisory problem and to ascertain its effect on the employees. While there he talked individually with some of the employees and his interrogations on the causes of the turnover were answered almost with a consensus: the center of the disaffection was Frick. Although the company's general policy had been to allow the workers to take two breaks each day and to use the telephone when reasonably necessary, he had not permitted any of these practices. Mention was made also of the company's low wages. Byram left assurances that he was undertaking a solution to these intolerances, that they would be remedied, but that this could not be done "today or overnight".

Havas was offered the position of manager at Brookpark on October 18 and accepted the next day. After first visiting the company at its Toledo headquarters, he took over at Brookpark on October 31. While in Toledo Byram outlined to him the company's customs, including breaks and telephone usage.

Meanwhile, in mid-October, the employees had decided to walk out because of the grievances just enumerated. They spoke to a union representative about protection if they carried out this plan; they were told that there would be no protection unless they presented their worries through a union. These discussions did not occur on company property, for every means was adopted to keep the proposal secret. No one in management learned of it until November 1, 1974 when the Union asked for recognition.

On November 6 Havas, after five days at work, told the employees of the company's policy on breaks and telephone use. At the same time he set 8:00 each morning for starting work, adding that they would be expected to do the housekeeping in their area of work. He ended with the assurance that if any of them had questions or problems, his office door was open to them.

This factual recount, taken from the Board's findings, of itself irrefutably demonstrates that the Frick discipline had been rescinded voluntarily by Litton before ever having word of the proposal of a union. In *J. P. Stevens & Co. v. N.L.R.B.,* 461 F.2d 490, 492 (4 Cir. 1972), for the court Judge Boreman phrased the question next before us in these words:

---

**3.** The Board also found that Litton's conduct interfered with a subsequent election by the employees on December 19, 1974, vacated it

and set another, the Union having been defeated in the first. The present case does not involve any of these questions.

"The issue in such cases is the Company's motive. The question is whether there is substantial evidence to support a finding that the employer's intent in granting the benefit or in timing the announcement of the granting of the benefit was to restrict its employees' freedom of choice by giving them cause to infer that the benefit might be withdrawn or future benefits withheld should they select a union to represent them." [Citations omitted.]

■ On this issue the Board was obligated to prove that the restorative acts of the company were undertaken to sway the employees in accepting or rejecting union organization. We so declared in *Monroe v. N.L.R.B.,* 460 F.2d 121, 124 (4 Cir. 1972), saying through District Judge Young:

"Once Monroe [the employer] had come forward with a substantial and legitimate business justification for its conduct, the burden was on the Board to show that the improvements were granted for the purpose of influencing the outcome of the election. *N.L.R.B. v. Gotham Industries, Inc.,* 406 F.2d 1306 (1st Cir. 1969)."

The Board altogether failed to satisfy this requisite. Its default is emphasized by Member Jenkins in his dissent. In this, he abridged the case with this summary:

"There is no evidence linking the announcement of the coffeebreak, telephone, and open-door policies to the advent of the Union. The fact that the announcement came 5 days after the Union's demand for recognition does not support an inference that it was prompted by that demand, in the face of the Employer's manifest prior concern over these matters and its plain intent to remedy them at an early moment. . . . Before having any knowledge of union activities, management had learned of the employee morale problems at Brookpark and their causes, promised to remedy them, replaced the manager, advised the new manager of the company policies involved in the morale problems which were not being followed at Brookpark, and expected him to correct the problems. The new manager's correction of the cof-

feebreak and telephone problems within a week after his arrival appears to be an expected conclusion to these prior events rather than a response to union activity. His invitation to employees to discuss any problems they might have is a normal concomitant to the redress of employee morale problems."

It is not clear why the Board wanted to "get into the act". Seemingly, it would prefer an intra-company solution of an intra-company difficulty. Furthermore, the employer was in an unenviable predicament. Had it not moved to heal the employees' hurts, it would have been open to criticism for neglecting its obligations; but when it did apply a cure the Board accused it of unfair labor practices.

To repeat, we are of the opinion not to uphold the Board's sanctions.

Order not enforced.

CRAVEN, Chief Judge (dissenting):

Paraphrasing my brothers, it is not clear to me why *they* want to "get into the act," p. 1088, especially since this act is committed by the Congress to the Board. Indeed, we have been told to stay out of such matters and warned that our duty to canvass

"the whole record" in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. *Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views,* even though the court would justifiably have made a different choice had the matter been before it de novo. (Emphasis added.)

*Universal Camera Corp. v. NLRB,* 340 U.S. 488–490, 71 S.Ct. 465 (1950).

My disagreement is not so much with my brothers' belief that they can draw an inference as well or better than the Board as it is with their belief that they are empowered to do it.

For most of September and all of October the company knew of its employees' grievances and changed not. On November 1 it learned of Union activity and claimed majority representation. Five days later the Company acted unilaterally—giving the employees what they sought. Coincidence, my brothers say. To thwart the Union campaign, says the Board, and points to the new manager's testimony that he did not consider making changes until after the November 1 Union demand. Surely, management's testimony constitutes substantial evidence.

Having sought in vain for the authority of the court to substitute its viewpoint for that of the Board, I respectfully dissent.