FUN STRIDERS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 80–7452, 80–7557.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 9, 1981.

Decided Oct. 8, 1981.

Dissenting Opinion Aug. 26, 1982.

Kyle D. Brown, Hill, Farrer & Burrill, Los Angeles, Cal., for petitioner.

William Wachter, Washington, D. C., for respondent.

Before HUG and FARRIS, Circuit Judges, and CLAIBORNE,* District Judge.

FARRIS, Circuit Judge:

Fun Striders, Inc., petitions for review of an order of the National Labor Relations Board finding that Fun Striders violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976), by discharging and refusing to reinstate four employees who Fun Striders believed had distributed certain literature during an unannounced employee work stoppage. *See Fun Striders, Inc.*, 250 N.L.R.B. 520 (1980). Fun Striders contends that the NLRB erred (1) by finding the employees' distribution of communist-oriented literature to be protected activity and (2) by failing to apply a dual or mixed motive analysis to the discharges. The NLRB cross-applies for enforcement of its order. We set aside the order and refuse enforcement.

---

* Honorable Harry E. Claiborne, Chief United States District Judge for the District of Nevada, sitting by designation.

## I. THE DISPUTE

Fun Striders, Inc., is engaged in the manufacture of shoes and handbags. On August 24, 1978, in protest of the piece-rate set on a new shoe style, stitching department employees in one of its three plants stopped work. While the employees were on the picket line, members of the Progressive Labor Party appeared outside the plant and began selling their newspapers. The Party members offered to prepare and provide leaflets relating to the labor dispute. An employee, Carranza, accepted the offer, assisted in the preparation of a leaflet, and distributed it the next day. The leaflet urged employees to strike and to form a union. It also advocated "violent revolution," "destruction of all bosses," and "armed revolution of all the working class." Other leaflets of a similar nature were distributed by employees on the next two working days. At the conclusion of the protest, Atkins, the plant manager and an avowed anticommunist, refused to allow four employees (Carranza, Castro, Marin, and Ruiz) to return to work because he believed they were associated with the Party and had advocated the violent overthrow of the plant and its supervision.

On February 8, 1979, the Board's regional director issued a complaint alleging that the refusal to reinstate the four employees violated sections 8(a)(3) and (1) of the Labor Act, 29 U.S.C. §§ 158(a)(3), (1) (1976). The administrative law judge held that Fun Striders had violated section 8(a)(1). As to the section 8(a)(3) charge, the judge found that Fun Striders did not act out of anti-union animus. Because such animus is an element of section 8(a)(3) violations,[1] he made no finding regarding the alleged violation of section 8(a)(3). The Board affirmed and ordered remedies including reinstatement, back pay, and notice posting. *Fun Striders, Inc.*, 250 N.L.R.B. 520, 520 (1980).

## II. SECTION 8(a)(1) VIOLATION

Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by [section 7 of the Act, 29 U.S.C. § 157 (1976)]." Section 8(a)(1) was intended as a general definition of employer unfair labor practices. Violations of it may be either derivative, independent, or both.

### A. Derivative Violation

A derivative violation is premised on a violation of sections 8(a)(2)–(5), 29 U.S.C. § 158(a)(2)–(5) (1976), which establish more specific categories of employer unfair labor practices. In general, a violation of one of these provisions will support a finding that section 8(a)(1) has been derivatively violated. *See NLRB v. Swedish Hospital Medical Center*, 619 F.2d 33, 35 (9th Cir. 1980) (dictum). Here, however, the Board failed to find a section 8(a)(3) violation. The Board's counsel is therefore precluded from justifying the section 8(a)(1) violation as a derivative violation.

### B. Independent Violation

Section 8(a)(1) may also be violated by acts that do not violate the more specific provisions. Such a violation is established by showing:

(1) that employees are engaged in protected activities, *American Ship Building Co. v. NLRB*, 380 U.S. 300, 308, 85 S.Ct. 955, 962, 13 L.Ed.2d 855 (1965);

(2) that the employer's conduct tends to "interfere with, restrain, or coerce employees" in those activities, *see Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1080 (9th Cir. 1977) (quoting section 8(a)(1)) (interrogation); and

---

1. *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). Although no proof of anti-union motive is required when the conduct is "inherently destructive" of employee rights, in such cases the employer may rebut the resulting presump-

tion by proving that the challenged actions were motivated by legitimate business considerations. *See id.* Here, the administrative law judge's specific finding of a lack of anti-union animus resolved the motive issue in favor of the employer.

(3) that the employer's conduct is not justified by a legitimate and substantial business reason, *see Textile Workers Union v. Darlington Manufacturing Co.*, 380 U.S. 263, 269, 85 S.Ct. 994, 999, 13 L.Ed.2d 827 (1965).

*See generally* 18B T. Kheel, *Labor Law* § 10.02[2] (1981).

■■■ 1. *Protected Activity.* The administrative law judge found that the distribution of the leaflets was protected activity. Fun Striders contends that the judge applied an incorrect legal standard in making this finding. It argues that the judge should have considered the political content of the leaflets. Distribution of literature that is purely political is an unprotected activity. *E.g., Firestone Steel Products Co.*, 244 N.L.R.B. No. 148, 102 L.R.R.M. 1172 (1979) (state political campaign literature); *Ford Motor Co.*, 221 N.L.R.B. 663, 666 (1975) (political campaign literature), *enforced mem.*, 546 F.2d 418 (3d Cir. 1976); *see also Ford Motor Co. (Rouge Complex)*, 233 N.L.R.B. 698, 705 (1977) (NLRB conceded Revolutionary Communist Party literature unprotected). Where, however, leaflets contain non-political matter as well as political matter related to employee interests, distribution is protected. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 563–70, 98 S.Ct. 2505, 2511–14, 57 L.Ed.2d 428 (1978). The administrative law judge could properly conclude that distribution of the leaflets here was protected activity. *See also Veeder-Root Co.*, 237 N.L.R.B. 1175, 1176–77 (1978).

2. *Interference.* Fun Striders does not dispute that its refusal to reinstate the employees interfered with distribution of the leaflets.

3. *Business Justification.* Fun Striders contends, however, that its refusal to reinstate was justified. It argues that the violent, destructive nature of the material in the leaflet provided a legitimate business reason for its actions. It also asserts that the Board erred in finding a violation where Fun Striders' motives were entirely legitimate. While admitting that the legitimacy of Fun Striders' motive precluded a section 8(a)(3) violation, the Board contends that motive is irrelevant to the section 8(a)(1) violation.

■■■ Although anti-union motive is required in section 8(a)(3) violations, it is not an essential element of section 8(a)(1) violations. *See Textile Workers Union v. Darlington Manufacturing Co.*, 380 U.S. 263, 269, 85 S.Ct. 994, 999, 13 L.Ed.2d 827 (1965). Nonetheless, motive is relevant.[2] In a section 8(a)(1) discharge case, if an employer demonstrates a legitimate, substantial business reason for the dismissal, "the burden shifts to the Board to establish that the primary motivation for the discharge was to penalize the employee for his [protected activity]." *NLRB v. William S. Carroll, Inc.*, 578 F.2d 1, 4 (1st Cir. 1978); *see Litton Dental Products v. NLRB*, 543 F.2d 1085, 1087–88 (4th Cir. 1976); *NLRB v. Elias Brothers Restaurants, Inc.*, 496 F.2d 1165, 1167 (6th Cir. 1974) (per curiam) ("motiv[ation] in part"); *NLRB v. Fairview Hospital*, 443 F.2d 1217, 1219 (7th Cir. 1971) (motive must be solely legitimate); *see also NLRB v. Alamo Express, Inc.*, 430 F.2d 1032, 1035–36 (5th Cir. 1970), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 584, 27 L.Ed.2d 633 (1971); *NLRB v. Crosby Chemicals, Inc.*, 274 F.2d 72, 74 & n.5 (5th Cir. 1960).

■■■ The leaflets urged the employees to engage in a violent struggle against management. Fun Striders reasonably believed that this advocacy threatened to inject violent confrontation into the plant. It had a legitimate and substantial business reason to keep those it believed had distributed the offending leaflets out of the plant by refusing to reinstate them. Once Fun Striders made this showing, the Board had the

---

**2.** Our previous cases do not clearly define the relevance of employer motive in a section 8(a)(1) proceeding. *See, e.g., Ad Art, Inc. v. NLRB*, 645 F.2d 669 (9th Cir. 1980) (assuming, without deciding, that anti-union animus is required to find section 8(a)(1) violation); *Ste-*

*phens Institute v. NLRB*, 620 F.2d 720, 726 (9th Cir.) (upholding findings that sections 8(a)(1) and (3) had been violated, without separate analysis, in a single paragraph discussing dominant motive test), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980).

burden of proving that Fun Striders' true motive was to interfere with protected activity. Its failure to carry this burden led to the administrative law judge's specific finding that Fun Striders had no anti-union animus.

Where, as here, the employer acts out of entirely legitimate motives, the business need to preserve peace precludes a finding that section 8(a)(1) has been violated by refusal to reinstate employees advocating violence. The result may differ in another case, where the employer's motives are mixed or in any event less clearly legitimate than here. The record before us, however, does not support the Board's determination that Fun Striders violated section 8(a)(1). Its order is set aside.

Enforcement denied.

HUG, Circuit Judge, dissenting:

I respectfully dissent.

The record clearly reveals that the decision not to allow Carranza, Castro, Ruiz and Marin to return to work was made solely by one man, Jack Atkins, the director of manufacturing. Therefore, the relevant inquiry in this case is the reason for his decision.

It is admitted that the reason was that Atkins believed the four persons had passed out leaflets at the entry gate. It is troubling that he could identify no reason why he believed Marin was involved in that activity. He stated he saw Carranza and Castro handing out the leaflets and saw Ruiz holding a stack of them, but he could state no reason why he thought Marin had been involved. This, of course, leads to a possible inference that his reason was not solely because of the leaflet activity, but rather that the four were key instigators in the employee demands and organizational efforts.

However, neither the ALJ nor the Board based their decisions on that ground. They concluded that the four employees were not allowed to return to work because they had passed out the leaflets and that this was a protected activity.

The essential question in my judgment is whether the Board was correct in determining that passing out the leaflets was a protected activity. If the Board's finding that this constituted a protected activity is a finding supported by substantial evidence, then under our standard of review the Board's order must be enforced.

There is no doubt that the leaflets had heavy communist overtones and that this was very offensive to Atkins. He could, indeed, have fired the employees for distributing communist literature if it was not a protected activity. No state action was involved in this case. The Supreme Court in *Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976) has held that first amendment free speech issues are not involved in unfair labor practice cases. As pointed out in several of our opinions, an employer can discharge an employee for a good reason, a bad reason or no reason so long as it is not for protected activity. *Lippincott Industries, Inc. v. NLRB*, 661 F.2d 112, 115 (9th Cir. 1981); *L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337, 1341 (9th Cir. 1980).

Therefore, because there was no labor contract that required good cause for discharge and because an employer may then discharge an employee for a good reason, a bad reason, or no reason unless it involves a protected activity, the issue is whether they were discharged for a protected activity.

I find this to be a close question. The leaflets contained considerable communist rhetoric and some encouragement to organize communist units within the factory. I have no doubt that if this were the sole content of the leaflets, the distribution would be unprotected political activity. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 563–70, 98 S.Ct. 2505, 2511–14, 57 L.Ed.2d 428 (1978). However, the leaflets also contained considerable material relating to the conditions of employment that were the subject of the labor dispute between Fun Striders and its employees. Distribution of such material is protected by the National Labor Relations Act. *Id.* at 565, 567–68, 98 S.Ct. at 2512, 2513–14. The mixture of

protected and unprotected matter in a leaflet presents a special problem. *Eastex* dealt with this problem in the context of whether the material was unprotected so as to justify an employer in preventing its distribution on company premises. The situation is different in the heat of a labor dispute. It is apparent that a balance must be struck. Certainly the distribution of a political leaflet does not become a protected activity merely because the leaflet contains a reference to employee complaints. On the other hand, the distribution of a leaflet that is directed toward expressing employee dissatisfaction with conditions of employment will not be removed from the protection of the Act merely because the leaflet contains some political statements. Considerable latitude in language in the expression of employee complaints has traditionally been allowed in the midst of a labor dispute. *See Linn v. United Plant Guard Workers, Local 114*, 383 U.S. 53, 61–63, 86 S.Ct. 657, 662–663, 15 L.Ed.2d 582 (1966). *NLRB v. Cement Transport, Inc.*, 490 F.2d 1024, 1029–30 (6th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974). It seems that more latitude should be allowed in finding protected activity when the consequences are the discharge of an employee for expressions of views during a labor dispute than would be the case when the issue is the prospective application of an employer rule.

In any event, in this case, the ALJ and the Board both concluded that on balance the distribution of these leaflets was protected activity. This is an area of labor law in which the expertise of the Board is entitled to considerable deference. For this reason, I would agree with the majority that this finding was supported by substantial evidence and the conclusion was not an abuse of discretion.

Having found that the distribution of the leaflets was protected activity, the majority concludes the refusal to reinstate was nonetheless justified by a legitimate business reason. The justification is that "Fun Striders reasonably believed that this advocacy threatened to inject violent confrontation into the plant." It is here that I part company with the majority.

Atkins clearly found the communist material personally offensive. He related that he had been in Hungary and Poland on a factory tour for five months, had seen the way the communist system worked in those factories, and found it most oppressive. He is a sincere and avowed anti-communist, and thus was enraged by the distribution of this literature. However, there is no evidence that he actually believed that this advocacy would result in violence in the factory.[1] His testimony only indicated his

---

1. The transcript of Atkins's initial testimony reveals the following:

> Q  Okay. And at the time you denied reinstatement to Mr. Ruiz and Mr. Marin, you based your decision on good faith belief that these people had distributed literature?
>
> A  Yes.

There was no further testimony concerning any fears that the distribution of the literature would lead to violence in the factory.

At a later point in the transcript when Atkins was recalled as a witness the testimony was as follows:

> Q  So you fired the four people because of your belief that they were communists at the time?
>
> A  I object to that word "fired." They were not welcome back to work.
>
> Q  You didn't welcome them back because of your belief that they were communists at that time?
>
> A  That's right.

> Q  You never interviewed these particular people at that time to obtain their explanations regarding these events; is that correct?
>
> A  You mean did I have conversation with the four people who were not welcome back?
>
> Q  Yes.
>
> A  Other than telling them on that August—
>
> Q  Did you ever ask them for their particular side of the story with respect to the leaflets?
>
> A  No.
>
> Q  In fact, you never had a conversation with them after the walk-out commenced; is that correct?
>
> A  Uh-huh.

There was no further testimony that Atkins thought this would lead to violence in the plant. This elaboration by Atkins, that he refused reinstatement because the distribution of the literature indicated that they were communists, would be relevant to a mixed motive determi-

displeasure with the contents of the leaflets and his belief that the four were communists. He did not notify his supervisors of any such potential violence. He did not indicate that the past conduct of these employees justified such a conclusion. I find nothing in Atkins's testimony to indicate that this action was necessary to preserve the peace at this factory, nor that he even believed it was necessary.

If there were a question whether the four employees were discharged for their protected section 7 concerted activities, or their unprotected communist organizational efforts, then we would engage in the dual motive analysis. This analysis would be in accordance with the new approach set out in *Wright Line*, 251 NLRB No. 150, 105 LRRM 1169 (1980), as approved in our circuit in *Doug Hartley, Inc. v. NLRB*, 669 F.2d 579, 580–81 (9th Cir. 1982); *NLRB v. Nevis Industries, Inc.*, 647 F.2d 905, 909 (9th Cir. 1981). Under that test, once the General Counsel had shown that union or another section 7 protected concerted activity was "a motivating factor," the employer would bear the burden of proving that the denial of reinstatement would have been made in the absence of the employee's participation in the protected activity.

In this case, the ALJ, the Board, and the majority all agree that the motive for the denial of reinstatement was the distribution of leaflets and they also agree that this was protected activity. The mixed motive analysis is thus unnecessary.

Because I find no evidence that Atkins denied reinstatement for a legitimate business reason, I would enforce the order of the Board.

nation. It would bear on the question whether the four employees were denied reinstatement because of protected or unprotected activity as

discussed *infra*. However, it provides little, if any, support for a finding of immediate threatened violence in the factory.