**RETLAW BROADCASTING CO., a subsidiary of Retlaw Enterprises, Inc., d/b/a KJEO–TV, Channel 47, Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.**

Nos. 93–70378, 93–70437.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 17, 1994 *.

Decided April 26, 1995.

---

* The panel unanimously finds this case suitable for submission without oral argument pursuant to

Fed.R.App.P. 34(a) and 9th Cir.R. 34–4.

Thomas E. Campagne, Fresno, CA, for petitioner-cross-respondent.

Lisa Richardson Shearin, N.L.R.B., Washington, DC, for respondent-cross-petitioner.

Before: FARRIS, BOOCHEVER, and BRUNETTI, Circuit Judges.

BOOCHEVER, Circuit Judge:

In 1991, Retlaw Broadcasting Company ("Retlaw") fired Gene Haagenson, a weekend on-air anchor at Retlaw's KJEO–TV in Fresno, California, for "unsuitability as an on-air artist," following Haagenson's allegedly deficient coverage of the Oakland fire. Haagenson's union, the American Federation of Television and Radio Artists ("AFTRA"), filed a complaint with the National Labor Relations Board ("NLRB"). Over Retlaw's contention that the dispute was subject to arbitration, the NLRB affirmed the administrative law judge's decision that Retlaw violated the National Labor Relations Act by offering Haagenson reinstatement only if he waived his right under the collective bargaining agreement to grievance procedures and union representation regarding any further termination. Retlaw petitions for review of the NLRB's decision, and the NLRB cross-petitions for enforcement of its order. We deny the petition for review and grant the petition for enforcement.

## FACTS AND PROCEDURES

Retlaw does business as KJEO–TV, a CBS-affiliated television station in Fresno, California. Haagenson worked for Retlaw as a weekend local news anchor on Saturdays and Sundays, and as a general assignment reporter on Mondays and Tuesdays. Haagenson was covered by a collective bargaining agreement ("CBA") between Retlaw and AFTRA. The CBA provided that an on-air artist terminated for "unsuitab[ility] for the Company's broadcast requirements" was not challengeable by arbitration if the fired employee received severance pay. Disciplinary discharges or discharges for misconduct, including insubordination, however, were subject to normal grievance and arbitration procedures.

On Sunday, October 20, 1991, the day the Oakland fire began, Haagenson was at KJEO–TV preparing the evening newscast. The Oakland fire developed into a tremendous calamity involving the loss of many lives, homes, and other property, and News Director George Faulder felt that Haagenson was slow to cover the breaking story, in spite of Faulder's express direction to cover the fire aggressively.

Faulder considered that Haagenson's behavior showed his "incompetence and insubordination," and that KJEO–TV's late coverage made the whole news operation look terrible. On the morning of the next day, October 21, Faulder told general manager Don Drilling that he wanted to fire Haagenson immediately. Drilling tried to calm Faulder down, and prepared a memorandum terminating Haagenson but giving him two options for ending his relationship with Retlaw.

On Tuesday, October 22, Haagenson was sent to Faulder's office when he arrived at work and was told he was fired. Faulder gave Haagenson the memorandum prepared by Drilling. The memorandum stated that because of Haagenson's "failure to use 'common journalistic sense'" in his coverage of the Oakland fire, and because Retlaw's research "indicates that our audience finds your on-air performance lacking," Haagenson

was "unsuitable for future KJEO employment." The memo gave Haagenson two choices under a heading of "Severance Benefits." Proposal A stated that Retlaw would terminate Haagenson for unsuitability as of this date and pay him severance benefits under the CBA, which provided that if an "On–Air Artist" (such as Haagenson) were discharged for "unsuitab[ility] . . . for the Company's broadcast requirements . . . the determination . . . shall not be challengeable by arbitration" as long as Retlaw chose to pay severance pay to the terminated employee. Proposal B provided "working severance," keeping Haagenson on staff for four weeks to allow him to look for other work. The memo recommended that Haagenson consult with AFTRA about Proposal B, since it was not an option under the CBA.

After several days of negotiations, Haagenson telephoned Faulder to ask whether he "had a chance to consider giving me some hope that I might be able to stay on after the end of four weeks?" Haagenson testified:

> And [Faulder] indicated that he had, but it would have to be on the condition that I would agree to waive my rights under the union contract to any kind of termination procedure after that.

> He said, I don't want you coming back for a month, and then a month later, you are slacking off and I have to fire you. And then I have to go through all the rigmarole [sic]. You know, you've got to agree. And I'm not—he said, I'm not sure that the union will let you, but you know, you see if you can do that. And those are the conditions under which I will consider rehiring you. That if you—only that you would go through this four-week period and then after that, I could, you know, basically terminate you at will.

After thinking it over, Haagenson called Faulder the next day and chose Proposal A, immediate termination with severance pay,

telling Faulder "I didn't feel I could go along with that. But to continue working for a few weeks with no guarantee of anything and then to—would be foolish. I would be better off taking the first proposal and getting severance pay and looking for another job." Haagenson came in on October 28 to sign the memorandum, and spoke to Drilling, telling him, "I didn't see how what [sic] I could do differently in four weeks to make Bud [Faulder] change his mind. I thought that his standards for evaluating me were too subjective, and I wouldn't be able to please him anyway, so I might as well take the severance pay and look for another job." Drilling also signed the memorandum.

AFTRA filed a charge against Retlaw on November 15, 1991. An Administrative Law Judge ("ALJ") declined to defer the case to arbitration,[1] and determined that Retlaw violated the National Labor Relations Act ("NLRA") when it "constructively discharged or denied reinstatement" to Haagenson by requiring him to "waive both his contract rights to protection against unjust termination *in perpetuity* as well as . . . waive his rights to secure union representation respecting a future termination" as a condition for continued employment (emphasis in original). The NLRB issued a decision and order affirming the ALJ's decision.

## DISCUSSION

This court upholds decisions of the NLRB "if its findings of fact are supported by substantial evidence and if the Board correctly applied the law," and defers to any "reasonably defensible" interpretation of the NLRA. *NLRB v. General Truck Drivers, Local No. 315,* 20 F.3d 1017, 1021 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). "A reviewing court may not 'displace the [NLRB]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.'* " *SKS Die Casting & Mach., Inc. v.*

---

1. Although the issue whether this dispute was arbitrable is summarily mentioned in Retlaw's opening brief, it has not been fully briefed, and we therefore decline to address it. *See Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v.*

*Louisiana Hydrolec,* 854 F.2d 1538, 1548 (9th Cir.1988) (per curiam) (if brief fails to contain appellant's contentions, and citations to authorities, statutes, and the record, issue is waived).

*NLRB,* 941 F.2d 984, 988 (9th Cir.1991) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). Credibility determinations by the ALJ are given great deference, and are upheld unless they are " 'inherently incredible or patently unreasonable.' " *Local 512, Warehouse & Office Workers v. NLRB,* 795 F.2d 705, 712 (9th Cir.1986) (quoting *Photo-Sonics, Inc. v. NLRB,* 678 F.2d 121, 123 (9th Cir.1982)).

### I. *Offer to settle potential grievance*

■ Retlaw argues that Faulder's offer to rehire Haagenson, if Faulder could thereafter fire Haagenson at will, did not require Haagenson to waive his right to grieve any future termination. Instead, Retlaw claims that Faulder was merely offering to settle a potential grievance. Although the CBA provided that a termination for unsuitability could not be grieved, so that Haagenson could not grieve his termination as classified in the separation memorandum, Retlaw asserts that Faulder's statement was an attempt to settle a potential grievance over whether Haagenson properly was classified as an "on-air artist" who could be terminated for unsuitability.

The ALJ credited Haagenson's description of his telephone conversation with Faulder. The ALJ concluded that Faulder's statements were fairly interpreted not as an attempt to settle a potential grievance, but as requiring Haagenson and AFTRA to waive Haagenson's right to protection against unjust termination, whether for unsuitability or for any other reason, in perpetuity. Faulder did not give a different description of his statements. The NLRB affirmed the ALJ's finding.

We find that substantial evidence supports the NLRB's finding that Faulder's statements required Haagenson to waive his right to file a grievance regarding *any* future termination, whether for unsuitability or otherwise, should he return to work at Retlaw. As the ALJ noted, the "fair meaning" of Faulder's proposal was that after four weeks Faulder could "basically terminate [Haagenson] at will."

### II. *Agreement to waive representation for future terminations*

■ The NLRB found that Faulder's statements to Haagenson denied him reinstatement in violation of § 8(a)(1) of the NLRA, which provides "[i]t shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7 of the NLRA, 29 U.S.C. § 157]." 29 U.S.C. § 158(a)(1). An independent violation of § 8(a)(1) "is established by showing: (1) that employees are engaged in protected activities ...; (2) that the employer's conduct tends to interfere with, restrain, or coerce employees in those activities ...; and (3) that the employer's conduct is not justified by a legitimate and substantial business reason." *Fun Striders, Inc. v. NLRB,* 686 F.2d 659, 661–62 (9th Cir.1981) (citations and quotations omitted). *See Teledyne Indus., Inc. v. NLRB,* 911 F.2d 1214, 1216–17 (6th Cir. 1990) (employer violates § 8(a)(1) if it refuses to reinstate employee for exercising rights guaranteed by NLRA). Anti-union motive is not required, but may be relevant if the employer demonstrates a legitimate and substantial business reason for the challenged action. Once the employer establishes a legitimate business reason, the NLRB has the burden to establish that the primary motive for the adverse action was to punish the employee for protected activity. *Fun Striders,* 686 F.2d at 662.

The first question is whether Haagenson was engaged in protected activity. The NLRA protects the right of employees "to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. "[T]he honest and reasonable invocation by a single employee of a right contained in a collective bargaining agreement is a concerted activity within the meaning of the [NLRA]." *NLRB v. Howard Elec. Co.,* 873 F.2d 1287, 1291 (9th Cir.1989).

In its discussion of the appropriate remedy, the NLRB found that Haagenson would have accepted the offer of reinstatement if Faulder had not required a waiver of Haagenson's rights under the CBA to grievance procedures and union representation regard-

ing any future termination. That conclusion was based on Haagenson's statements upon choosing to leave Retlaw under Proposal A, which involved termination with severance pay, rather than staying on pursuant to Faulder's requirement that Haagenson waive the grievance procedures for any future terminations. We find that substantial evidence supports the NLRB's finding that Haagenson was engaged in the protected activity of asserting his rights under the CBA. *See SKS Die Casting,* 941 F.2d at 988 (reviewing court may not displace NLRB's choice between fairly conflicting views).

The second inquiry is whether Retlaw interfered with Haagenson's protected activity. The NLRB found that Faulder's statements "requir[ed] a waiver of rights from Haagenson ... which may not properly be demanded ... [and] put Haagenson to an improper choice which chilled his [29 U.S.C. § 157] rights." That finding supports a conclusion that Faulder's conduct interfered with Haagenson's protected activity of asserting his grievance rights under the CBA. *See Prince Trucking Co.,* 283 NLRB 806, 808, 1987 WL 89611 (1987) (coercive violation of § 8(a)(1) to condition end of layoff on dropping of grievances); *A & D Davenport Transp., Inc.,* 256 NLRB 463, 463 n. 2, 467, 1981 WL 20472 (1981) (violation of § 8(a)(1) to require that employees refrain from exercising Section 7 rights in return for reemployment), *enforced,* 688 F.2d 844 (7th Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 736, 74 L.Ed.2d 958 (1983).

■ The third question is whether Retlaw's conduct was justified by a legitimate and substantial business reason. Retlaw asserts no legitimate business reason for Faulder's requirement that Haagenson waive his rights to grieve any future termination as a condition of his reinstatement. Instead, Retlaw again characterizes Faulder's state-

ments to Haagenson as an offer of settlement, and claims its business justifications for offering settlement were the same as its justification for discharging Haagenson as unsuitable. We may not displace the NLRB's choice between two fairly conflicting views, *see SKS Die Casting,* 941 F.2d at 988, and accordingly we affirmed above in Part I the NLRB's conclusion that Faulder's statements were not an offer of settlement of a specific potential grievance, but instead a requirement that Haagenson waive his right to grieve any termination in the future. Retlaw did not demonstrate any legitimate business justification for its conduct, and thus there was no burden on the NLRB to establish an anti-union motive on Faulder's part.[2]

## CONCLUSION

We deny Retlaw's petition for review and grant the NLRB's petition for enforcement of its order.

---

2. The NLRB in this case found an independent violation of § 8(a)(1), which requires anti-union motive only upon the employer's showing of a legitimate business justification. Retlaw confuses this with a derivative violation under § 8(a)(1) and (a)(3), which requires the employee to make a prima facie showing that the employee's protected conduct was a motivating factor in the discharge. *See Fun Striders,* 686 F.2d at 662 (anti-union motive required for § 8(a)(3) but not

§ 8(a)(1) violation); *Torrington Extend–A–Care Employee Ass'n v. NLRB,* 17 F.3d 580, 591, 596 (2d Cir.1994) (determinative issue in charge that discharge or failure to reinstate violates § 8(a)(3) is employer's anti-union motivation). Because only § 8(a)(1) is in issue here, Retlaw's citations to the cases following *Wright Line, Inc.,* 251 NLRB 1083, 1980 WL 12312 (1980), and Retlaw's arguments regarding constructive discharge, are inapposite.